UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

CT IRONWORKERS EMPLOYERS ASSO., : No. 3:10CV-165 (SRU)
ET AL                          : 915 Lafayette Boulevard
          vs.                  : Bridgeport, Connecticut
                               :
                               : August 7, 2014
NEW ENGLAND REGIONAL COUNCIL   :
OF CARPENTERS                  :

- - - - - - - - - - - - - - - - x

MOTION HEARING

B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

    FOR THE PLAINTIFFS:

        HARNETT GLADNEY HETTERMAN
            4399 Laclede Avenue
            St. Louis, Missouri  63108
        BY:  PAUL C. HETTERMAN, ESQ.
            RONALD C. GLADNEY, ESQ.

    FOR THE DEFENDANT:

        MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO PC
            One Financial Center
            Boston, Massachusetts  02111
        BY:  KEITH CARROLL, ESQ.
            KEVIN McGINTY, ESQ.

        KRAKOW & SOURIS
            225 Friend Street
            Boston, Massachusetts  02114
        BY:  CHRISTOPHER SOURIS, ESQ.

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (917)703-0761

1                    (3:30 O'CLOCK P. M.)

2              THE COURT:  Good afternoon.  We're here in

3    Connecticut Ironworkers Employers Association v. New

4    England Regional Council of Carpenters.

5              Could I have appearances, please?

6              MR. HETTERMAN:  Paul Hetterman on behalf of the

7    plaintiffs, Your Honor.

8              MR. GLADNEY:  Ron Gladney one behalf of the

9    plaintiffs.

10             MR. CARROLL:  Keith Carroll for the defendant

11   New England Regional Council of Carpenters.

12             MR. McGINTY:  Kevin McGinty, also for the New

13   England Regional Council of Carpenters.

14             MR. SOURIS:  Christopher Souris also for the

15   Carpenters.

16             THE COURT:  Okay.  We're here obviously on the

17   motion for summary judgment.

18             I think I'd like some help in trying to

19   understand a couple of things that were briefed.

20             Let me start with the argument that the

21   plaintiff makes concerning PLA and the public bidding

22   laws.  I didn't see any to any such laws or any case law

23   interpreting such laws and so I'm a little unclear on

24   precisely what you're relying on, but perhaps

25   fundamentally for today's purposes, I'm not completely

1    following your argument about how any such laws affect the

2    antitrust analysis.

3            MR. HETTERMAN:  Our position on that is that the

4    defendant has claimed that it is entitled to the

5    nonstatutory labor exemption to the antitrust laws which

6    is their affirmative defense.

7            THE COURT:  Right.

8            MR. HETTERMAN:  And they claim that they are

9    entitled to that because the subcontracting in the clause

10   that they've relied upon here is contained within the

11   collective bargaining agreement and, therefore, they are

12   entitled to the exemption.

13           However, they also admit in their memorandum in

14   support of their Motion for Summary Judgment that their

15   subcontracting clause does not apply to projects that are

16   governed by PLA or the projects that are governed by

17   public bidding laws.

18           So our position is if you admit that your

19   subcontractor clause does not apply to these projects,

20   then you're admitting that your CBA does not apply to

21   those projects and, therefore, you're admitting that the

22   nonstatutory labor exemption to the antitrust laws doesn't

23   apply.

24           THE COURT:  But the clause is what you're

25   worried about, so if the clause doesn't apply, where is

1    the antitrust problem?

2            MR. HETTERMAN:  Because they are still trying to

3    enforce this.  They are still telling people you have to

4    work, assign the work to competent carpenters.

5            THE COURT:  And where is the evidence of that?

6            MR. HETTERMAN:  Oh, the evidence is ample, Your

7    Honor.  For example, in the William Berry case, the

8    defendant signed a PLA that said the work had to be

9    assigned to any qualified contractor, but then there's the

10   other side of Berry that said that ten items of work has

11   been to be assigned to the Carpenters, regardless of what

12   the PLA says.  So, in essence, they were saying we've

13   signed the PLA, we're not going to be bound by it.  We

14   want to go by the side agreement that we have over here.

15           And then you have instances where they claim

16   that on some of their so-called settlement agreements,

17   they have, they have pursued grievances against

18   construction mangers who have made assignments of relevant

19   work to non-carpenters contractors, and the Carpenters on

20   behalf of them filed a grievance and said you broke the

21   contract, you violated the subcontracting clause.

22           But it's clear that in those instances, the

23   project in question was either a public bid project or a

24   PLA project where a subcontracting clause doesn't apply.

25           So, in essence what they were doing is going to

1    the CM and saying you broke the contract when there was no

2    broken contract because the contract didn't apply to them.

3            And so our contention is that you can't claim

4    that you're enforcing your subcontracting clause on these

5    projects when in fact the subcontracting clause doesn't

6    apply.  But the fact is -- they legally can't do that but

7    in fact they are doing that and that's the problem that we

8    have, is that they are going to CMs on a job covered by

9    PLA or public bid and saying you have to assign this work

10   to our contractors, and they rely upon their

11   subcontracting clause to support it even though their

12   subcontracting clause doesn't apply.

13           So what you have is you have a work assignment

14   agreement or a subcontracting agreement that's not

15   entitled to any labor law protection because it's not,

16   because the agreement is not contained within the

17   enforceable CBA because the subcontracting clause that's

18   in the CBA does not apply.  They've admitted that.

19           So that's what we have.  I'm not sure that's --

20           THE COURT:  So basically what you're saying is,

21   in a PLA context, they cannot have a subcontracting

22   agreement that limits the contractor to use of carpenter

23   employees.

24           MR. HETTERMAN:  That is correct.

25           THE COURT:  Why not?

1          MR. HETTERMAN:  Because they've admitted their

2     subcontracting clause doesn't apply in those

3     circumstances.

4          THE COURT:  No, no -- okay, but -- fair enough,

5     but --

6          MR. HETTERMAN:  Okay.

7          THE COURT:  Where's the antitrust problem with

8     them going to a contractor saying we want you to agree to

9     hire, to use contract carpenters labor?  Where is the

10     problem in that?

11          MR. HETTERMAN:  Well, the problem depends upon

12     the role that that person plays in the construction

13     industry.  For example, if they go to a contractor and say

14     we want you to sign an agreement saying you only assign

15     this work to carpenter contractors, if there's no

16     collective bargaining context, that's clearly a violation

17     of AD, and in our opinion a clear violation of the

18     antitrust laws.

19          You can't just have a naked restriction on

20     competition, saying we're going to eliminate competition

21     and you just assign all of the labor work over to us.

22     Now, they contend that's within the context of the

23     collective bargaining agreement and, therefore, it's

24     entitled to labor law protection and our contention is

25     that it's not.

1          But if you just want to take that agreement

2    without any labor law ramifications and say we want to go

3    to a contractor and have him agree to assign all of his

4    work to us and not do business with anyone else, well,

5    that's the problem you're getting into now.

6          THE COURT:  All right.  Let's step back, because

7    I think I haven't been given what I need to understand the

8    PLA public bidding process.

9          MR. HETTERMAN:  Okay.

10          THE COURT:  Okay?  Here's one possibility.  One

11    possibility is there's a PLA contract to build a building.

12    We're going to build a school, all right?  It's governed

13    by some PLA somewhere.

14          One possibility is you go to the lowest bidder.

15    What contractor can build this school, what responsible

16    contractor can build this school for the least money.  Oh,

17    okay, it's X Corporation.  X Corporation has a collective

18    bargaining agreement with carpenters and when they bid,

19    they have to factor in the cost of labor under that

20    contract and it may mean that they are not the lowest

21    bidder because they may have higher labor costs than a

22    nonlabor shop but they, it turns out they win the bid.

23          Now, why wouldn't the CBA apply in that context?

24    The PLA, at least by my scenario, is simply saying

25    whoever, whatever contractor is the lowest bidder gets it

and whatever that contractor has by way of a collective

bargaining agreement still applies, doesn't it?

MR. HETTERMAN:  Well, there wouldn't be any

problem with that, Your Honor, because there's a bidding

process.

THE COURT:  Okay.

MR. HETTERMAN:  And that's all we're asking for.

We're saying allow there to be the bidding process.  And

if an Ironworker contract --

THE COURT:  Whoa, but, step back, because I

guess what I'm not understanding is at what level does the

bidding process take place?  Is it simply what contractor

can build a building, is that the only bid, or does each

piece of the work get bid under this PLA public bidding

law?  In other words, is there a bid on the windows and a

bid on the steel and a bid on the roof and a bid on

everything else?

MR. HETTERMAN:  That depends, Your Honor, when

you get into how the bid package is put out by the

construction manager or the architect.

THE COURT:  Okay.

MR. HETTERMAN:  And traditionally they are put

in certain packages and you would have certain contractors

who are affiliated with a certain trade bid on those

packages when the work involves work in which they are an

1    expert.

2              So, structural steel work would be bid on by

3    ironworkers.  Roofers -- the roofing would be bid on by

4    Roofers, general carpentry work would be bid on by

5    carpenters, and there's really no problem with that.

6              What happens is when you get into situations

7    where you have an overlap or more than one trade and their

8    respective contractors say we do that work.  For example,

9    metal panels --

10             THE COURT:  No, I get that.  That's a general

11   problem.

12             MR. HETTERMAN:  Okay.

13             THE COURT:  I'm still trying to understand the

14   PLA public bidding problem.  What is the problem here?

15             MR. HETTERMAN:  Well --

16             THE COURT:  If Contractor X wins the bid and

17   Contractor X -- to build the building -- if Contractor X

18   has a CBA with the carpenters, why wouldn't that CBA apply

19   to the work done building that building?

20             MR. HETTERMAN:  It would.

21             THE COURT:  Okay.

22             MR. HETTERMAN:  But --

23             THE COURT:  So when, in your view, and maybe in

24   the carpenters' view, would the CBA not apply in the PLA

25   context?  Because that's the whole crux of your argument,

1   it doesn't apply.

2           MR. HETTERMAN:  Well, no, it applies -- with

3   respect to the PLA -- let's say, for example, you have

4   mental panels and they are going to bid out the metal

5   panel work in its own package.  Okay?

6           THE COURT:  Okay.

7           MR. HETTERMAN:  Now, under the PLA, you can have

8   ironworkers, you can have laborers, you can have carpenter

9   contractors all bid for that work, and it goes to the best

10  bidder.

11          THE COURT:  Correct.

12          MR. HETTERMAN:  Now, once that contractor got

13  the job --

14          THE COURT:  Right.

15          MR. HETTERMAN:  -- if he is an ironworkers, he's

16  going to use ironworkers.  If he's a laborer, he's going

17  to use laborers.  If he's a carpenter, he's going to use

18  carpenters, and there's nothing wrong with that.

19          THE COURT:  Right.

20          MR. HETTERMAN:  The problem is, is that when

21  they eliminate that bid for the metal panels, they say

22  there's not going to be any bidding.  Ironworkers can't

23  bid on this, sheet metal can't bid on this, laborers can't

24  bid on this because only carpenters contractors can bid on

25  this.  That's the problem with that.

1          THE COURT:  Well, but how have the carpenters

2    done that?  If you're putting out a bid, if some public

3    entity is putting out a bid, and -- they are not saying

4    only carpenters can bid on this.

5          MR. HETTERMAN:  That's exactly what they are

6    saying.  They are putting out bid specs and in the couple

7    cases we're talking about here, they put out bid

8    specifications, for example, metal panels, and they'll say

9    this work has to be done by carpenters, or this work has

10   to be done by carpenters contractors.

11         THE COURT:  The contractor is saying that,

12   having done the bid.

13         MR. HETTERMAN:  No, no.  Let's say the

14   construction manager who's assigning out the work --

15         THE COURT:  Well, okay, that's -- I'm calling it

16   construction.  I don't see a difference frankly between a

17   construction manager and a contractor.  I just don't see

18   it.

19         MR. HETTERMAN:  Well, the contractor actually

20   employs people to do the work.  The construction manager

21   doesn't; he's more like a supervisor or broker.

22         THE COURT:  Okay.  But any contractor who wins a

23   bid can decide to sub out 100 percent of the work.

24         MR. HETTERMAN:  In accordance with the

25   subcontractor clause.

1          THE COURT:  Right.

2          MR. HETTERMAN:  Right.

3          THE COURT:  So how is that different than a

4   contract manager?  Contract manager, everybody knows from

5   the beginning is going to be subbed out, but it's no

6   different.

7          MR. HETTERMAN:  Well, traditionally, as I said,

8   the metal panel, you would have all these bids come in

9   from various different trades and various different

10  contractors, and that's your competition.  Those

11  contractors representing different trades are competing

12  for the metal panel work.

13         THE COURT:  Okay.

14         MR. HETTERMAN:  And there's no problem with that

15  at all.  The problem we have now is, is that what the

16  carpenters have done is said we want to eliminate that bid

17  process, and we're going to require the construction

18  manager to assign the work to a carpenter contractor.  So

19  the ironworkers -- there's nobody else gets to bid on it.

20         THE COURT:  But the construction manager had to

21  win the bid.

22         MR. HETTERMAN:  No, they -- they have a

23  different type of -- that's, they don't really, they might

24  have a bid situation in that they are pursuing the job as

25  construction manager.

1              THE COURT:  Right.

2              MR. HETTERMAN:  But they are not, but that's

3    just the role of the supervisor.  They are not going to do

4    any actual, they are not going to hire any skilled labor

5    to perform work on the job.  They are just, they are an

6    intermediary between the owner and the trades.

7              THE COURT:  All right.  I need some help

8    understanding the laws that you're relying on, because if

9    there's a public bidding law that says it has to go to the

10   lowest bidder, it's not going to get built if there's not

11   a bid.  You're saying there's no bid.

12             MR. HETTERMAN:  No, no.  Well --

13             THE COURT:  There's a bid somewhere.  Somebody

14   won the bid and you're calling it a construction manager.

15   I'm calling him a contractor.  Whatever they are, they won

16   a bid to build that building.

17             MR. HETTERMAN:  Well, or there might be no

18   bidding at that point.  The owner of the building may

19   decide to go to ABC Corporation and say I want you to run

20   this building project of mine.

21             THE COURT:  Okay.

22             MR. HETTERMAN:  I want you to be the

23   construction manager.

24             THE COURT:  All right.

25             MR. HETTERMAN:  ABC says fine, we'll be happy to

1  do that.  So they get the drawings --

2          THE COURT:  This is under a PLA?

3          MR. HETTERMAN:  Yes, it could be.

4          THE COURT:  All right, so if that happens,

5  where's the problem?  In other words --

6          MR. HETTERMAN:  There's no problem so far.

7          THE COURT:  Okay, all right.

8          MR. HETTERMAN:  So, ABC's got the job, there's

9  no problem.  The problem is that ABC then traditionally

10  would say, okay, we're going to send out all these bids

11  for work including let's say metal panel work, and we will

12  get responses to those bid requests.

13          THE COURT:  Right.

14          MR. HETTERMAN:  Ironworkers -- for example,

15  metal panels; we'll get ironworkers, we'll get sheet,

16  we'll get carpenter contractors all bidding to do that

17  work.

18          THE COURT:  Right.

19          MR. HETTERMAN:  And the construction manager,

20  working in his best interests and the best interests of

21  his owner, says I'm going to pick the best bid, and then

22  you have somebody won.

23          THE COURT:  Okay.

24          MR. HETTERMAN:  So far there's still no

25  problems.

1          THE COURT:  Okay, right.

2          MR. HETTERMAN:  Then that winning bidder --

3     let's assume it's an ironworker contractor, gets the work

4     assignment and then does the work using the Ironworkers.

5          THE COURT:  Okay.

6          MR. HETTERMAN:  No problem.  Now, if there is

7     some portion of that work that is, necessarily has to be

8     subcontracted out by that contractor, he can subcontract

9     it in accordance with his own subcontracting provision,

10     and there's no problems because there has been a bidding

11     process here to allow everybody to bid for that metal

12     panel.

13          What the carpenters are doing is saying we're

14     eliminating that.  From now on, all that work has to be

15     assigned to a carpenter contractor, and that's the

16     difference and that's the problem, is now --

17          THE COURT:  But here's where you lost me.

18          MR. HETTERMAN:  Okay.

19          THE COURT:  If the owner says I want ABC to do

20     this work and ABC says, you know what -- for whatever

21     reason -- I don't care if I get the lowest bid.  I'm going

22     to have somebody, I'm going to have my friend do it, my

23     buddy, do this work.  If it costs me a little extra, it's

24     going to cost me a little extra.  My buddy happens to be

25     somebody who has got a CBA with the carpenters.  Where is

there, how are the carpenters in that situation violating

the antitrust laws?

      MR. HETTERMAN:  Well, there's nothing wrong if

the owner or the CM says I want to use John Doe

Construction, Carpenter Company over here.

      THE COURT:  Okay.

      MR. HETTERMAN:  There's no problem because

there's no agreement.  There's no conspiracy to get to

that result.  There's a problem when -- let's say the

construction manager goes to the carpenters and says I

agree with you that I will give you all of this work.

Okay.

      THE COURT:  You're my buddy, in effect.

      MR. HETTERMAN:  Now, once you have that

agreement, then you've run into Section One problems,

because now you have an agreement that's in restraint of

trade because you've agreed in advance to give all this

work to the carpenters.  If, on the other hand, it's

just --

      THE COURT:  But if that's pursuant to a CBA, why

would that be a problem?

      MR. HETTERMAN:  Well --

      THE COURT:  In other words --

      MR. HETTERMAN:  If, if we can forget the CBA for

a second, we say that's an unlawful restraint of trade.

1    Without a CBA context, it's an unlawful restraint of

2    trade.

3            THE COURT:  So, all exclusive dealing is

4    unlawful?

5            MR. HETTERMAN:  Well, no, not all exclusive

6    dealing is.  Group boycotts pretty much are.

7            THE COURT:  Well, okay, but all you've painted

8    so far is a picture that the Connecticut ironworker

9    Employers Association always comes to your firm and, you

10   know what, you've just got this arrangement where they

11   always come to your firm.  And that's not a restraint of

12   trade.  There's lots of lawyers out there who would love

13   to bid for the work you're doing.

14           MR. HETTERMAN:  Well, not unless there's an

15   agreement they'll always come to your firm.  Then that's

16   an unlawful restraint of trade.

17           THE COURT:  It's called a retainer, isn't it?  I

18   mean --

19           MR. HETTERMAN:  You can have -- obviously when

20   you, when you hire somebody, you've entered into an

21   agreement with them to do the work and there's no problem

22   with that from an antitrust standpoint.

23           THE COURT:  I'm going to have you handle all of

24   my labor business and I'm going to enter into an agreement

25   that you're going to bill me a really low rate of only

1    $500 an hour and you're going to do all my labor work.

2    That's a restraint in trade?

3              MR. HETTERMAN:  Well, it can be, depending upon

4    more details, but that would be considered to be an

5    exclusive dealing arrangement --

6              THE COURT:  Right.

7              MR. HETTERMAN:  -- which under some

8    circumstances can be a restraint in trade.

9              But what we're talking about is a group effort

10   here.  For example, a group of lawyers say we agree we're

11   not going to do any business with Judge Underhill, we're

12   not going to do that.  Now, individually each lawyer can

13   say, each lawyer can say independently I'm not going to do

14   business with Judge Underhill and there's no problems, but

15   when they get together and say we agree we're not going to

16   do business with Judge Underhill, then that's an unlawful

17   restraint of trade.

18             THE COURT:  And who's agreeing in this case?

19             MR. HETTERMAN:  In this case in the CBA you've

20   got thousands of carpenters who are agreeing to this

21   agreement and you've got hundreds of construction managers

22   and contractors who are agreeing to it because it's all

23   wrapped around the CBA.

24             THE COURT:  Through CBAs, right.

25             MR. HETTERMAN:  Then we have to deal with -- but

1    if we eliminate -- we call the CBA for purposes of the

2    union aspect of it, the labor negotiations aspect of it.

3    If we forget about the CBA aspect of it for a second and

4    just assume you've got 20,000 carpenters agreeing with

5    2,000 contractors not to do business with ironworkers,

6    that is a clear unlawful restraint of trade.  There's no

7    question about that.

8          Now, if you put it in a collective bargaining

9    context, now you got to bring labor law into it.  And now

10    you say this agreement, which otherwise is clearly

11    unlawful under the antitrust laws, isn't safe because of

12    the labor law protection and that's where you get into

13    your nonstatutory labor exception, and in this particular

14    case we also have AD, but it's a concerted refusal to

15    deal.  That's your group boycott.

16          THE COURT:  So who's refusing to deal with whom?

17          MR. HETTERMAN:  Well, the construction managers

18    and contractors who are signatory with the carpenters are

19    refusing to do business with non-carpenter contractors,

20    which would be the plaintiff contractors and obviously

21    their respective trades.  That's what they are saying

22    we're going to do, so we're not going to do business with

23    those people.  That's the group boycott.

24          THE COURT:  But that's precisely which was going

25    on in Local 201, isn't it?  Isn't that precisely --

1          MR. HETTERMAN:  Local 210?

2          THE COURT:  Sorry, Local 210.  Isn't that

3    exactly what the 2nd Circuit --

4          MR. HETTERMAN:  Well, what the 2nd Circuit said

5    was, is that the question in this case is whether or not

6    the clause itself, the language of the clause, is a

7    violation of AD for purposes of unfair labor practices.

8          THE COURT:  Right.

9          MR. HETTERMAN:  They said that based upon the

10   facts in that particular case, we think this is not a

11   violation of AD.  And, therefore, there is no unfair labor

12   practice.  And the only evidence that the plaintiff had in

13   the case was the language of the subcontracting clause and

14   the Court said, well, if the subcontracting clause

15   language itself is okay under AD, and you've got no other

16   evidence of an antitrust violation, there's no antitrust

17   violation.  That's all the Court said.  They just simply

18   said the language is okay, and there they were talking

19   about the difference between restrictions on

20   subcontracting to someone and restrictions on receiving

21   subcontracts from someone.

22         THE COURT:  Even broader than here.

23         MR. HETTERMAN:  In that respect.

24         THE COURT:  Yes.

25         MR. HETTERMAN:  It was a to or from.  And we

1    don't have a problem with that idea that the language is

2    acceptable, we have a problem with the way they are

3    enforcing it.  But the first part is to get over the idea

4    of the antitrust violation because it's clearly an

5    antitrust violation.

6              THE COURT:  If they are only enforcing the

7    language and the language is legal, where is the problem?

8              MR. HETTERMAN:  Well, the problem is, if we

9    assume for a moment that the language that we're talking

10   about here and the enforcement of the language under AD is

11   okay, well, the problem you have is that they are trying

12   to enforce a provision of the collective bargaining

13   agreement on a project that they admit isn't governed by

14   the collective bargaining agreement, and that's where you

15   have the problem.

16             THE COURT:  Well, I know you keep hammering this

17   admission but I don't have any authority at all for what

18   the PLAs that you're relying on are, what the public

19   bidding laws are, why the collective bargaining agreement

20   wouldn't apply in those situations.  I mean you've got a

21   throw-away line in their brief and you're resting your

22   entire case on it and I don't understand how --

23             MR. HETTERMAN:  No, well --

24             THE COURT:  -- the CBA doesn't apply in a PLA

25   context.  This is where we started.  So, in the PLA

1    context we bring in the construction manager; the

2    constructing manager has an agreement or decides to hire a

3    contractor who's got a collective bargaining agreement

4    with the carpenters.

5            MR. HETTERMAN:  Okay, and there's no problem

6    with that.

7            THE COURT:  There's no problem with that.  That

8    agreement has a subcontract.  That subcontract says you

9    can't use anybody but carpenters for this kind of work and

10   there's no problem with that.

11           MR. HETTERMAN:  No, the problem is, is when the

12   construction manager takes bids and gives the award to the

13   company that has the best bid --

14           THE COURT:  Okay.

15           MR. HETTERMAN:  -- no problem with that.

16           THE COURT:  Great.

17           MR. HETTERMAN:  Okay.  But when the construction

18   manager says I'm not going to bid, I'm just going to give

19   the work to the carpenters --

20           THE COURT:  So sue --

21           MR. HETTERMAN:  -- that's the problem.

22           THE COURT:  So sue the manager.  Why are you

23   suing the carpenters?

24           MR. HETTERMAN:  Because they are the ones behind

25   it all.  The construction managers don't want to do this

1    on their own.  There's no business reason for them.  The

2    only reason they are doing it is because they've forced to

3    do it by the carpenters.

4         THE COURT:  When you say force, I mean where's

5    the evidence of that?

6         MR. HETTERMAN:  Well --

7         THE COURT:  The construction manager wants to do

8    the best thing for the owner and himself.

9         MR. HETTERMAN:  Which would typically would be a

10   bidding process.

11        THE COURT:  But -- typically.  But if they just

12   happen, they just know that, whatever, Turner Construction

13   is a great company and they want to hire Turner, they hire

14   Turner.

15        MR. HETTERMAN:  That's fine.  If they do it on

16   their own, there's no problem.  But if they do it because

17   of an agreement with the carpenters, that's where you have

18   the problem.

19        THE COURT:  Well, where's the agreement with the

20   carpenters?  Where is there evidence of an agreement with

21   the carpenters?

22        MR. HETTERMAN:  It's in every case.  In every

23   single instance we have here, there's evidence that the

24   construction manager did whatever he did because of his

25   agreement with the carpenters.  It could be simply because

1    the carpenters filed a grievance against him, claiming he

2    violated the collective bargaining agreement.  Or it could

3    be because, for example, in MRS where you had First

4    Construction who awarded the work to MRS, turned around

5    and said, oh, wait a minute, I've got to take it back from

6    you because of my contract with the carpenters.

7              THE COURT:  So you're -- --

8              MR. HETTERMAN:  That's clearly anti --

9              THE COURT:  So you're blaming the carpenters for

10   his misinterpretation of the contract with the carpenters.

11             MR. HETTERMAN:  No, I'm blaming the carpenters

12   because the contract that they had in that particular case

13   cannot be enforced in those circumstances.  That's what

14   we're saying.

15             The question is, is that, are these construction

16   managers doing all this stuff that's completely contrary

17   to their best interest on their own or are they doing it

18   because they have an agreement with the carpenters.

19             THE COURT:  Well, where's the evidence it's

20   against their best interest?

21             MR. HETTERMAN:  Because it makes no business

22   sense to simply lock yourself into an agreement with the

23   carpenters as opposed to letting the bidding process be

24   open to everyone.

25             THE COURT:  Look, was there a bidding process

1    when you got this work?  People in the real world hire

2    professionals all the time without bidding processes.  And

3    the fact that the construction industry often using

4    bidding doesn't mean it's an antitrust violation not to do

5    that, or that you're acting against your best interest not

6    to do that.

7              MR. HETTERMAN:  If I understand what the Court

8    is saying, is that, well, for example, at MRS they did

9    it -- MRS lost the business because of the contract with

10   the carpenters.  And --

11             THE COURT:  And, and the interpretation given by

12   a non-carpenters union person was I believe I can't give

13   you this work.

14             MR. HETTERMAN:  Right, and he had a very good

15   reason to think he couldn't give MRS the work because the

16   carpenters have a history of suing construction managers

17   who do just what MRS said it couldn't do, and that is to

18   give the work to a non-carpenters contract.  They get

19   sued.  It's what happens.  They file a grievance against

20   them.

21             I mean that's what they do.  There's no

22   question, you know, the evidence in the case, there's

23   plenty of it where they've sent letters you have broken

24   your agreement by assigning this work to a non-carpenters

25   contract.

1       THE COURT:  Which is true.

2       MR. HETTERMAN:  Well --

3       THE COURT:  If they have a subcontracting clause

4   that says you can't assign the work to -- then -- what's

5   wrong with enforcing a contract?

6       MR. HETTERMAN:  Because the contract is a

7   violation of the antitrust laws.  That's -- I mean every

8   violation of the antitrust laws under Section One involves

9   some sort of agreement.

10      THE COURT:  Okay.  Let's back up.  Do you

11  concede that if the subcontracting clause is in a CBA that

12  applies to a particular job, there's no antitrust problem

13  even if the carpenters threaten to sue someone for

14  breaching that agreement.

15      MR. HETTERMAN:  No.

16      THE COURT:  Okay, why not?

17      MR. HETTERMAN:  No.  If -- when we talk about

18  the collective bargaining aspect of the agreement, we're

19  automatically bringing in a labor law exemption.  Okay.

20  So, if we take a contract that is otherwise unlawful

21  because it's an unlawful restraint of trade or

22  unreasonable restraint of trade, the question is can that

23  agreement be saved by the labor law exemption.

24      So then we have to look at the labor law

25  exemption and see does this apply.  And the briefs, at

least our brief has discussed the various elements for applying the nonstatutory labor exemption with six different things. And if the agreement and the enforcement of the agreement falls within, satisfies all six elements, then you're fine. You satisfy the exemption and even though you would otherwise have a violation of the antitrust laws, you're protected by the labor laws. That's what you have.

And what we're saying is that these agreements that the carpenters have with the construction managers that requires the construction managers to assign the work to a carpenter contractor, are violations of the antitrust laws unless they are protected by the labor law.

Our burden in this case is to prove that these contracts, without labor law consideration, violate the antitrust laws. Their burden is to prove that they are entitled to the labor law exemption. So that's where we get the different burden as to who has to do what.

And when we talk about the PLAs and the public bids, that's part of their claim because what they are saying is, is that these agreements are protected under the labor law exemption because it's all part of the collective bargaining process. But then they turn around and admit that some of those projects aren't subject to the collective bargaining agreement because they are

1    governed by PLAs and public bidding laws.

2         So now they have somewhat of a quandary, because

3    on the one hand, they have to prove, it's their burden to

4    prove that the agreement that pertains to each of those

5    projects is governed by a collective bargaining agreement.

6    But they've admitted that PLA and public bid projects

7    aren't subject to the collective bargaining agreement.

8         So they have to somehow come up with some other

9    theory that even if the project, governed by PLA or public

10   bid, is not governed by the collective bargaining

11   agreement, are somehow still entitled to the labor law

12   exemption.  And they haven't offered that.  They don't

13   even address the PLA public bids in their memo, other than

14   to say the projects governed by PLA or public bid aren't

15   subject to the CBA and then they leave it.  You know, we

16   bring up the fact that if it's governed by PLA or public

17   bid, you lose your labor exemption and they ignore it in

18   their response.  They don't address it at all.

19        THE COURT:  All right, let's get specific.  Show

20   me a contract in the record that you think violates the

21   antitrust laws.

22        MR. HETTERMAN:  The very project where they have

23   the PLA, the PLA says the --

24        THE COURT:  Where is it?  I want to see it.

25        MR. HETTERMAN:  The actual contract?

```
 1                  THE COURT:  Yes.

 2                  MR. HETTERMAN:  Oh, let's see.

 3                  (Pause)

 4                  MR. HETTERMAN:  It would be Exhibit 70, Your

 5      Honor, Defendant's Exhibit 70.

 6                  THE COURT:  Seventy?

 7                  MR. HETTERMAN:  Yes, sir.

 8                  THE COURT:  Okay.

 9                  (Pause)

10                  THE COURT:  All right, walk me through, why is

11      this a problem?  This is an agreement between a

12      construction manager and the trades council and affiliated

13      unions.

14                  MR. HETTERMAN:  And that agreement is not a

15      problem, Your Honor.  The problem is that the carpenters

16      then negotiated the side agreement that was in conflict

17      with that agreement.

18                  THE COURT:  Okay.

19                  MR. HETTERMAN:  And that side agreement is what

20      we're complaining about.

21                  THE COURT:  Well, show me that.

22                  MR. HETTERMAN:  That is 71, Your Honor.

23                  THE COURT:  All right.

24                  (Pause)

25                  THE COURT:  All right.  And is the problem that
```

1     they entered into this agreement, or what it says?

2          MR. HETTERMAN:  Well, the problem is that they

3     enforced the agreement.  If they entered into it and

4     didn't enforce it, we wouldn't be worried about it.

5          And the problem is that PLA says the work has to

6     go to qualified bidder, so that means all of our people

7     get to bid on the work, including one of those ten items

8     in Exhibit 71.

9          THE COURT:  So where is the PLA?  Show me where

10    it says that.

11         MR. HETTERMAN:  On the PLA?  It should be -- I

12    don't have it in front of me, Your Honor, but on the PLA,

13    Exhibit 70, it should be when the first two pages, there's

14    a reference that the work shall be assigned to any

15    qualified bidder.  I apologize I don't have that.

16         (Pause)

17         MR. HETTERMAN:  Actually, I'm sorry, Your Honor,

18    it should be on page two.

19         THE COURT:  Page two.

20         (Pause)

21         MR. HETTERMAN:  And according to my note, it

22    says the work may be assigned to any qualified contractor.

23         THE COURT:  Any qualified contractor.

24         MR. HETTERMAN:  Yes, Your Honor.  So that's the,

25    that's the standard for the bidding process, is that --

1            THE COURT:  But where are you getting "bidding

2    process"?  It says any qualified contractor.

3            MR. HETTERMAN:  Yes.

4            THE COURT:  So where does "bid" come into this?

5            MR. HETTERMAN:  Well, it's because that was the

6    nature of the PLA in the context there is that it's going,

7    that the CM is going to assign it to any qualified

8    contract.

9            THE COURT:  Right.

10            MR. HETTERMAN:  Right?  And if he had assigned

11    it on his own to the carpenters, okay.

12            THE COURT:  Well, he's not assigning it to

13    carpenters; he's assigning it to a contractor.

14            MR. HETTERMAN:  A contractor, right.  He picked

15    a contractor but he picked it because he was under a

16    contractual obligation to do that, and that's the unlawful

17    antitrust violation.  That's Exhibit 71, is that when they

18    entered into the contract that says you must give this

19    work to a carpenter contractor, that was the antitrust

20    violation.

21            And it also happens to be in be conflict with

22    the PLA because obviously the PLA doesn't say you have to

23    award the work to a carpenter contractor.  It says any

24    qualified contractor.

25            And so they went from saying the work can be

1    assigned to any qualified contractor, which opens the door

2    to anybody that's qualified, to a much now narrow,

3    restrictive, agreement that says it has to be a carpenter

4    contractor, and that's when they violated the law, not to

5    mention the PLA.

6          THE COURT:  Well, what's the violation of the

7    PLA?

8          MR. HETTERMAN:  I'm sorry?

9          THE COURT:  I don't see the violation of the

10   PLA.

11         MR. HETTERMAN:  Well --

12         THE COURT:  There's no suggestion here that they

13   gave it to an unqualified contractor.

14         MR. HETTERMAN:  Well -- not to get into that

15   point, Your Honor, but the point is that the PLA says that

16   you can't modify the terms of this agreement unless

17   everybody who is a party to this agreement signs off on

18   it.

19         Yes, I believe that's also on page two, Your

20   Honor.

21         (Pause)

22         THE COURT:  Do we have Schedule A for the

23   agreement, number -- Exhibit 70?  Because I'm looking at

24   the top of page two and it basically says "The work

25   covered by this agreement shall be contracted only to

contractors who agree to execute and be bound by the terms

of this agreement through the letter of assent attached as

Exhibit A and who are signatory to or eligible to have

been offered the opportunity to and subsequently execute

the appropriate multi-employer collective bargaining

agreements by the signatory unions," et cetera, et cetera.

"Each contractor shall require their subcontractors of

whatever tier to similarly execute the letter of assent

and the appropriate Schedules A."

I don't see a Schedules A but isn't -- how is

the memorandum of understanding, in effect, not part of

this?  Isn't that what the memorandum of understanding is

doing?

MR. HETTERMAN:  No, no, no, no, no, no.  The

memorandum -- in the PLA you'd have the unions and the

contractors sign off.  Everybody agrees to abide by the

terms of the PLA, and that's the language the Court has

just read.  There's other language that talks about the

assigning work to a qualified contractor and language that

says you cannot modify the terms of the PLA unless

everybody signs off on it.

What the carpenters did in this case is that

they went to the construction manager, Berry, and said we

don't like the PLA when it comes to work assignments so we

want you to guarantee in writing that you will assign ten

1 items of work to just carpenter contractors. There will

2 be no competitive bidding process for that work. We

3 automatically get it, and that's the violation, is when

4 they entered into that signed agreement, because that's,

5 that's an unlawful and unreasonable restraint of trade

6 because they are locking everybody else out.

7    THE COURT: Well, let me hear from Mr. Carroll

8 or somebody from over here because we've been going on for

9 quite a while.

10    MR. CARROLL: Actually we can pick up right

11 where we are right now on the Berry job. Berry was the

12 general contractor, construction manager, whatever label

13 you want to put on it.

14    Actually, I want to draw your attention to the

15 paragraph you were just reading, the very first sentence

16 says "The contractor has the absolute right to select any

17 qualified contractor." Your Honor's right on it. There's

18 no restriction in here as long as the, as long as Berry

19 selects a qualified contractor, they are in compliance

20 with the terms of the PLA.

21    Moreover, on that job and for the purposes of

22 this discussion, the relevant work that they've alleged

23 part of their antitrust claim, the assignment of work that

24 they are talking about here was from Berry to Tower Glass.

25 Tower Glass was signatory to the ironworkers, the glaziers

1    and the carpenters.  Then Tower Glass, as part of

2    its subcontract subcontracted the work down to the

3    plaintiff MRS who got the work, and then MRS assigned or

4    made a designation that carpenters were going to do the

5    work, and their complaint about it is because Berry

6    enforced the terms of its collective bargaining agreement

7    with the carpenters which, as we -- the whole first part

8    of this hearing was if it's in that context, there's no

9    problem with that.

10              I also want to focus, too, and they talk about

11    the memorandum of understanding which is Exhibit 71.

12    There's nothing in that agreement which talks about

13    subcontracting or bidding or anything like that.  All that

14    agreement is is a reaffirmation with Berry to say, hey,

15    you're the signatory to our have collective bargaining

16    agreement.  Our collective bargaining agreement says

17    you've agreed that these types of work are within the

18    jurisdiction of the carpenters and you're going to give

19    them -- you know, that work is claimed by the carpenters

20    and you previously agreed and so we're just reminding you

21    that in the context of you performing your work as the

22    general contractor on the Bay State job, you remember what

23    work is supposed to go to carpenters.

24              One of the other things that's interesting about

25    Berry and gets to one of those other sort of red herring

1  thresholds that they claim need to be satisfied and there

2  needs to be, whoever the construction manager is, has a

3  carpenter on the direct payroll, in that particular job,

4  and there's evidence in the record that we provided that

5  Berry did directly employ a carpenter on that job.  And

6  you have steward reports that indicate this was a

7  carpenter, at least one carpenter on that job every day

8  doing bargaining unit work.

9       So, in that context, if there's a collective

10  bargaining agreement and there are carpenters working and

11  under their made up test that there has to be an employee

12  of the person doing the subcontracting, all of those

13  things they are worried about are satisfied here.

14       But you don't even need to get to that because,

15  again, the memorandum of understanding says nothing about

16  subcontracting or bidding.  It just says this is the work

17  you've agreed will be assigned to carpenters.

18       And then the violation of the project labor

19  agreement which, again, I don't see it because it says the

20  contractor, in this case Berry, has the absolute right to

21  select any qualified contractor, and there's nothing in

22  the record to suggest that Berry didn't select a qualified

23  contractor -- unless they want to say that their own

24  signatory, Tower Glass, which is one of the two plaintiff

25  unions, isn't a qualified contractor.

1          I mean this all leads no where.  That's why I

2     don't understand -- you know, this is one of the jobs they

3     focus on but this one in particular doesn't get them

4     anywhere and we haven't even gotten to the whole antitrust

5     aspects of this, as to whether or not this even moves the

6     needle about any subjective analysis under the Sherman

7     Act.  We're still focused on the labor issue and they

8     don't get this.  This is protected and exempt from

9     antitrust scrutiny.

10          THE COURT:  Okay, and walk me through your

11     theory for that, because as we've, we heard many times in

12     the brief and we've heard many times today, you're

13     apparently acknowledging that the PLA -- in a PLA

14     situation, a collective bargaining agreement doesn't

15     apply.

16          MR. CARROLL:  That tends to overstate what our

17     position is.  The position that we have taken is that in a

18     PLA, a PLA or a public bid context, they are saying that

19     the collective bargaining agreement that we have should

20     not apply.  We say when there's a project labor agreement,

21     there is the general contractor or whoever the

22     construction manager is who has the bid.  Just because

23     they sign the PLA and the Carpenters sign the PLA doesn't

24     mean that our collective bargaining agreement goes away.

25     It just means there's a separate agreement that covers

1    what happens on that job.

2            But as we see in the Berry case in the Bay State

3    job, you can read the two together and there's no

4    violation that I've seen anywhere in the record to suggest

5    there's been any violation of the PLA.

6            Moreover, if what they say is true, that

7    everybody signed the PLA, if there's problem under the PLA

8    and they claim there's been some violation, there are

9    specific remedies set forth in the PLA for somebody who

10   says, you know, one of the aggrieved contractors says

11   something wasn't done properly, there's a mechanism

12   available for that which has never been used.

13           Moreover -- and Your Honor had alluded to this,

14   and I think you had asked Mr. Hetterman several times and

15   I'm still waiting for an answer -- that there's no

16   evidence in the record to suggest that any of these

17   decisions that they are claiming were made by the general

18   contractor/manager was done because they were forced to do

19   so by the carpenters.  There's nothing in the record to

20   suggest that.  And they can make all the allegations and

21   denials and speculate all you want, but at this point --

22   and that may have been enough to get them beyond, you

23   know, our motion to dismiss but not now.  We're at summary

24   judgment.  They need to have evidence and there's no

25   evidence in the record to support that.

1    THE COURT:  So, your argument with respect to

2    the PLA involving Bay State medical is that Berry is the

3    construction manager, selected however it was selected,

4    and Berry had a CBA with the contractors?

5    MR. CARROLL:  Correct.

6    THE COURT:  That had the disputed subcontractor

7    clause in it.

8    MR. CARROLL:  In fact, Berry has been a

9    signatory with the carpenters for 31 years up to that

10   point.

11   THE COURT:  Okay.  But the point is they had a

12   CBA.

13   MR. CARROLL:  Correct.

14   THE COURT:  And your argument is that the MOU,

15   that's Exhibit 71, is simply acknowledging the existence

16   and effect of the CBA which is what it says on the second

17   paragraph.

18   MR. CARROLL:  Yes, Berry 108, which is the

19   carpenters union in the jurisdiction where Bay State was,

20   the project was located, "acknowledges they're signatory

21   to the collective bargaining agreement whose terms and

22   conditions govern the carpenters' work in the Western

23   Massachusetts area.  In recognition of the contractual

24   obligations with Local 108, Berry agrees that the

25   following work to be performed at the Bay State Medical

1    Center Project is governed by the CBA and will be

2    performed by carpenters."

3              There's no magic there.

4              THE COURT:  Well, you're looking --

5              MR. HETTERMAN:  Could I respond, Your Honor?

6              THE COURT:  Yes, because, Mr. Hetterman, you're

7    looking at me like you just won the argument and I'm

8    looking at you like you just lost the argument.

9              MR. HETTERMAN:  I'm looking at page 34 of their

10   memorandum in support of summary judgment where they talk

11   about project labor agreements, and they say "Since a PLA

12   supercedes the CBAs of the defendant and other trades,

13   defendant's subcontracting clause has no bearing on such

14   projects."

15             Yet Mr. Carroll just stood up and said that they

16   had an MOU because of the subcontracting clause of the

17   CBA.  Now here he says that subcontracting clause doesn't

18   apply to PLA jobs.

19             THE COURT:  Well, put side the supposed

20   admission in his brief, and help me understand why this

21   situation is problematic.  Because what I'm seeing is the

22   PLA, where the construction manager has chosen, however

23   it's chosen, that construction manager has a CBA with

24   carpenters.

25             MR. HETTERMAN:  Right, but --

1          THE COURT:  And the CBA is then relied upon

2     to --

3          MR. HETTERMAN:  Because of -- now, you can say,

4     you know, to ignore the defendant's admission here as to

5     the legal significance of a PLA and public bid laws --

6          THE COURT:  Okay.

7          MR. HETTERMAN:  But --

8          THE COURT:  The problem I've got is neither side

9     is telling me any legal reason, any law, statute,

10    authority, case law, anything, why we ignore the CBA in

11    the context of a PLA.

12         MR. HETTERMAN:  Because that --

13         THE COURT:  I haven't seen -- I've seen nothing

14    on that.  It's driving me crazy because this is your whole

15    argument and it's not supported.

16         MR. HETTERMAN:  Well, but, Your Honor, to be

17    fair, it's their argument; not ours.

18         THE COURT:  Whoever's argument.

19         MR. HETTERMAN:  They're the ones that

20    admitted -- if my position is, yes, it does not apply to

21    PLA jobs and public bid laws, they've admitted it.

22         THE COURT:  Put aside the admission.  What's the

23    legal basis for the assertion that that's true?

24         MR. HETTERMAN:  Because the nature of the PLA is

25    that it is, in and of itself, a collective bargaining

1    agreement.  And it, you know, we go through all of the

2    language of that particular PLA, the language in there

3    makes it clear that no individual trade's CBA supercedes

4    the PLA.  It's just the opponent.

5              THE COURT:  All right.  So you're saying as a

6    matter of contract law, the PLA expressly provides that

7    the CBAs are not going to govern, is that what you're

8    saying?

9              MR. HETTERMAN:  Yes, and it's recognized within

10   the construction industry that that's the case.

11             THE COURT:  All right.  Well, hopefully you've

12   got an expert to say that but where in this agreement does

13   it say that?

14             MR. HETTERMAN:  Well, I don't have that page,

15   Your Honor.  If I might have a minute.

16             MR. HETTERMAN:  I'm referring, Your Honor, to

17   the case of Carpenters v. Operative Plasterers -- I

18   apologize for not having the entire cite, but it's 721 F3d

19   678, DC Circuit, 2013.  And they talk about PLAs and

20   specifically they say, "A PLA also typically standardizes

21   wages, work rules and hours, provides for the supremacy of

22   the PLA over conflicting provisions of individual

23   collective bargaining agreements, and contains no strike,

24   union security or dispute resolution -- and contains no

25   strike, union security and dispute resolution provisions."

1          So, I apologize, I don't have the specific

2     language from that particular PLA but I do have this

3     language from a DC Circuit Court of Appeals describing

4     your typical PLA.  Because the whole point of the PLA is

5     that everybody is governed by the same rules.  That way,

6     you don't have any problems on the job site.  If there are

7     problems on the job site, they are resolved in accordance

8     with the dispute resolution procedures set forth in the

9     PLA.

10         So the PLA controls.  It controls what's

11    happened.  And so everybody that's going to work on that

12    job, whether they are the direct contractor or

13    subcontractor or sub-subcontractor, ends up signing off on

14    the PLA and agreeing to be bound by the terms of the PLA.

15    That was the language the Court referred to earlier.

16         So, any individual trade CBA doesn't apply.  The

17    PLA becomes the CBA for all these workers.

18         THE COURT:  All right.  I don't know that

19    Exhibit 70 is complete but let me just read to you from

20    Article 2, Section 2-A, page four.  And one of you tell me

21    whether my intuition that what I refer to as Schedules A

22    are the respective collective bargaining agreements of the

23    various unions that are the subject of this agreement.

24    Because what it says is "The terms of this agreement,

25    including the Schedules A, shall apply to all project

1    work, notwithstanding the provisions of local and/or

2    national agreements which may conflict with or defer from

3    the terms of this agreement.  Where a subject covered by

4    the provisions of this agreement is also covered by a

5    Schedule A, the provisions of this agreement shall

6    prevail.  Re: Subjects that are covered by the provisions

7    of a Schedule A and not covered by this agreement, the

8    Schedules A provision shall prevail."  And it goes on.

9           But the point is, if the CBAs are the Schedules

10   A, if the PLA does not say anything about

11   subcontracting -- well, for one thing the CBA's

12   incorporated into the PLA and, two, the subcontract clause

13   of the CBA, if there's no subcontract clause in the PLA,

14   would apply by the terms of the PLA.

15          MR. HETTERMAN:  Well, under the PLA, from what

16   you've just read, the PLA says it supercedes any local

17   agreements.

18          THE COURT:  Any conflict.

19          MR. HETTERMAN:  Well, the conflict that you have

20   is that the language in the CBA that talks about any

21   qualified contractor and the side agreement which was

22   entered into contrary to the terms of the PLA, because not

23   everybody signed off on it.

24          THE COURT:  But, but -- okay.

25          MR. HETTERMAN:  I'm sorry if we're mixing

apples --

THE COURT:  The PLA -- I'm suggesting the PLA is incorporating by reference the collective bargaining agreements of the various unions, is that right?

MR. HETTERMAN:  No.

MR. CARROLL:  That is correct, the PLA has the collective bargaining agreements of the other unions.

THE COURT:  Well, one of you is --

MR. HETTERMAN:  I guess we've got a dispute of facts, Your Honor.

MR. CARROLL:  It's not material, because we still haven't gotten to the threshold issue if there's a conflict.

THE COURT:  Well, okay.

MR. HETTERMAN:  Well --

THE COURT:  It helps, it will help me to know if the Schedules A are the collective bargaining agreements because, if they are, they are incorporated and so, to be, the point is --

MR. HETTERMAN:  Well, the problem with that, Your Honor -- and I didn't mean to interrupt -- is that the language that, the CBA language of the individual contracts could not apply if, as you said, it's in conflict with the language of the PLA.

THE COURT:  Okay, and how is it in conflict?

1          MR. HETTERMAN:  Well, the language of the PLA

2     says the work can be assigned to any qualified contractor.

3     The language of the CBA says --

4          THE COURT:  All right, point me to that.  Let's

5     start there.

6          MR. HETTERMAN:  That was on page two.

7          MR. CARROLL:  Top of the first paragraph on page

8     two, Your Honor.

9          THE COURT:  All right.

10         MR. CARROLL:  "Contractor has the absolute right

11    to select any qualified contractor."

12         THE COURT:  Okay.

13         MR. HETTERMAN:  Thank you.

14         THE COURT:  All right.  So, where is the

15    conflict?

16         MR. HETTERMAN:  Well, that language says you can

17    give it to any qualified contractor.

18         THE COURT:  Right.

19         MR. HETTERMAN:  This says you have to give it to

20    the carpenters.  You went from having the choice of any

21    qualified contractor, be it Iron Sheet, Blazer or

22    carpenters, to having to give it to a carpenter.  To me,

23    that's inconsistent.  It conflicts.  You went from having

24    four options to having one.

25         THE COURT:  Only if the one is not a qualified

1    contractor.

2        MR. HETTERMAN:  Well, I disagree with the

3    Court's, you know, analysis of qualified contractor there

4    we're looking at it in terms of the authority that the CM

5    has, the flexibility that the CM has, and while they have

6    all that flexibility under the PLA, they have no

7    flexibility under the MOU.

8        The memorandum of understanding says that's

9    where the work has to go, to a carpenter contractor.  The

10   PLA says it does not have to go a carpenter contractor, it

11   can go to any qualified contractor.  So, if you went from

12   saying it could go to any qualified contractor and it does

13   not have to be a carpenter contractor, to saying it has to

14   go to a carpenter contractor, those are inconsistent.

15       And in the bottom of that article, Your Honor, I

16   guess that's Article One, where the phrase or the language

17   is in the contract that says You cannot change the terms

18   of the PLA unless everybody signs off on it.  Yet, the

19   only people that signed off on the MOU were Berry and the

20   carpenters.

21       THE COURT:  But all the MOU does is say we have

22   a CBA and the CBA has been attached to the PLA, so

23   surprise surprise.

24       MR. HETTERMAN:  Well, but you can't, but the

25   problem is their individual CBA is superceded by the PLA.

1    That's what that says.

2             THE COURT:  If there's a conflict.

3             MR. HETTERMAN:  And there's a conflict between

4    the language of the qualified contractor and carpenters.

5    Now, they want to say, well, maybe that was a qualified

6    contractor but that's not what we're talking about.  We're

7    talking about what flexibility the construction manager

8    had in making the assignment.

9             MR. CARROLL:  Your Honor, the flexibility the

10   Construction Manager has is the absolute right to select

11   any qualified contractor.  That's the flexibility they

12   have.  That's what the PLA says.

13            I, again, Your Honor, Your Honor's right on it.

14   There's no conflict here.  I don't -- again, and just to

15   point out just so we remember who got the work here, Tower

16   Glass is signatory to the Glazers, the ironworkers and the

17   carpenters.  And MRS, the plaintiff, was subcontracted

18   from Tower Glass to do the work and MRS is signatory with

19   the ironworkers, Sheet Metal Workers and actually at the

20   time they had already abrogated their agreement with the

21   carpenters but there were -- because the work, the scope

22   of the work they were going to do was part of the

23   jurisdictional claim of the Carpenters as set forth in the

24   Local 108 CBA, which Berry was a signatory to, and had

25   valid subcontracting clause under the labor laws, MRS,

1    they got to do the work but they had to use carpenters.

2         And that's, that's the Berry and Bay State job

3    in a nutshell, and I am struggling to find any issue with

4    that that trips on the labor issues, and we haven't gotten

5    to any sort of analysis under the antitrust laws because

6    there is no -- I mean, even if you were to assume there's

7    no labor exemption or the proviso's not applying, you have

8    to subject it to antitrust scrutiny -- this doesn't get

9    them there.

10        MR. HETTERMAN:  Your Honor, so the problem is on

11   that particular job, when MRS was given the assignment to

12   do the panel work, it announced it was going to use Iron

13   and Sheet Metal Workers to do it, and then they were told

14   by Berry that they had to use carpenters.  That's the

15   problem.  And that's where the contract, the MOU between

16   Berry and the carpenters come in.  In the bidding process,

17   MRS got it.

18        THE COURT:  But what I'm hearing is Berry told

19   them to do it.

20        MR. HETTERMAN:  Yes.

21        THE COURT:  But -- I mean you're trying to hold

22   the contractors liable for the action taken by Berry.

23        MR. HETTERMAN:  No, no, no.  I'm holding the

24   carpenters liable and --

25        THE COURT:  I'm sorry, I misspoke, yes, holding

1    the carpenters liable --

2         MR. CARROLL:  -- because he should be holding

3    the contractors liable.  That's what he should be doing.

4         MR. HETTERMAN:  I'm holding the carpenters

5    liable because they are the ones who told Berry to tell

6    MRS to use carpenters.

7         THE COURT:  All right.  Where is that in the

8    evidence?

9         MR. HETTERMAN:  Well, Your Honor, that is in the

10   record, that would be in testimony that was provided by

11   Roland Lebeck (ph) and one or two other witnesses who were

12   present at the first meeting when the assignments were

13   made and announcement when MRS said we're going to use

14   non-carpenters on the job.

15        MR. CARROLL:  Assuming there's anything wrong

16   with that, on that particular issue, we're not talking

17   about subcontracting there.  We're talking about job

18   assignment, which has nothing to do with what this case is

19   about.  That is not an antitrust violation.  Which trade a

20   subcontractor is required to assign work to is not an

21   antitrust violation.

22        MR. HETTERMAN:  Yes, it is, if you do it by

23   agreement.  It's a clear antitrust violation because what

24   the carpenters is doing is saying, Berry, we have a

25   contract with you, that's the agreement under Section One,

1    and that requires you not to do business with

2    non-carpenter contractors.

3            MR. CARROLL:  The agreement is like --

4            MR. HETTERMAN:  And that's the unlawful

5    restraint of trade.  And here, the evidence is that they

6    enforced the agreement by requiring MRS to use carpenters

7    on the job when MRS didn't want to use carpenters on the

8    job.  It wanted to use ironworkers and Sheet Metal

9    Workers.  So it was told you have to use carpenters, by

10   Berry, or you're going to lose the job.  And so the

11   evidence is, is that Roland Lebeck then said he went back

12   to the Iron and Sheet Metal Workers and said here's the

13   problem.

14           THE COURT:  Berry has told me to use carpenters.

15           MR. HETTERMAN:  Well, Berry says if you don't

16   use carpenters, we're going to yank the job back.

17           THE COURT:  Okay.

18           MR. HETTERMAN:  So Roland Lebeck says I have to

19   use carpenters, so --

20           THE COURT:  Right.

21           MR. HETTERMAN:  In order to keep the job.

22           THE COURT:  And that's why you sued Berry.

23           MR. HETTERMAN:  We didn't sue Berry, we sued the

24   carpenters.

25           THE COURT:  That's my point.

1          MR. HETTERMAN:  Well, the point is, Your Honor,

2     going back to the beginning, so to speak, is that Berry

3     would have been fine with carpenters not doing the job.

4     Berry would have been happy if he'd had ironworkers and

5     sheet metal workers do the job.

6          THE COURT:  And we know that because --

7          MR. HETTERMAN:  Because that's who they had

8     selected to do the job.  They awarded the job at MRS to

9     use the ironworkers and sheet metal workers.

10          THE COURT:  Well, they -- where is the evidence

11     that they told MRS to use ironworkers?

12          MR. HETTERMAN:  Well, they didn't tell them to;

13     they just knew that MRS was an ironworker and sheet metal

14     worker signatory.

15          THE COURT:  I'm getting a lot of assumptions in

16     "they just knew" and "we just know," and so forth.  We're

17     at summary judgment.  You have to point me to the record

18     where these things are laid out because you're speculating

19     and you're asking in effect the jury -- well, you're

20     asking me to allow a jury to speculate.  That's the

21     problem.

22          MR. HETTERMAN:  Well --

23          THE COURT:  Unless you can point me to so-and-so

24     said, so-and-so from the carpenters had a meeting with

25     so-and-so from Berry and then --

1          MR. HETTERMAN:  And that, I apologize, Your

2     Honor, I don't have the specific page citations, but that

3     is contained in the testimony of Roland Lebeck, that he

4     was tole that he had to use carpenters.  He testified --

5          THE COURT:  Wait, wait.  Time out.

6          MR. HETTERMAN:  Yes, sir.

7          THE COURT:  "He was told," passive voice.

8          MR. HETTERMAN:  Yes.

9          THE COURT:  Who from carpenters forced him to do

10     that?  We only have one defendant here.

11          MR. HETTERMAN:  Okay.  Well, the thing is, Your

12     Honor, Berry said you have to use carpenters because of

13     Berry's agreement with the carpenters.

14          THE COURT:  Okay.  So Berry interpreted their

15     agreement with carpenters.

16          MR. HETTERMAN:  Right.

17          THE COURT:  And Berry, based upon his

18     interpretation of this agreement with carpenters, went to

19     MRS and said we understand, based upon our agreement, that

20     you have to use -- and so how does that implicate

21     carpenters?

22          MR. HETTERMAN:  Because it's that agreement.

23     It's the agreement between Berry and the carpenters.

24          THE COURT:  And so if somebody misinterprets an

25     agreement that they have with a third party, the third

1   party becomes liable for the second parties'

2   misunderstanding?

3           You're attributing wrongdoing from Party A to

4   Party B simply because they have a contract.

5           MR. HETTERMAN:  Well, that's it.  The contract

6   is the wrongful act.  It was the unlawful restraint of

7   trade.  That is the unlawful act to which Berry and the

8   carpenters are parties.  The reason we only sued the

9   carpenters is because all of these contracts --

10          THE COURT:  The restraint of trade is a CBA.

11          MR. HETTERMAN:  That's a separate question, Your

12  Honor.

13          THE COURT:  That's the only contract you're

14  pointing to when you're saying there's an antitrust

15  violation is the CBA.

16          MR. HETTERMAN:  Okay.

17          THE COURT:  You're saying the CBA's an antitrust

18  violation because it requires them to use carpenters.

19          MR. HETTERMAN:  Okay.  Then the question becomes

20  whether the provision that they refer to in their CBA is

21  protected by the labor law, and our position is it can't

22  be protected by the labor law because the subcontracting

23  clause in the CBA doesn't apply to projects governed by a

24  PLA.

25          THE COURT:  But I have no authority for that

1  proposition, and what I have is a PLA that expressly

2  incorporates the CBA that you're complaining about.

3  　　　　MR. HETTERMAN:  Well, even if it did -- and I

4  don't think that it does, Your Honor -- I don't think it

5  incorporates the CBAs.

6  　　　　THE COURT:  Well, all right, let's go back.  I

7  need counsel to give me affidavits regarding what are the

8  Schedules A to Exhibit 70, because the Schedules A, which

9  I'm assuming are the CBAs of the various unions, are

10  incorporated into the PLA by its express term.

11  　　　　MR. HETTERMAN:  Well, the other problem, Your

12  Honor, is that --

13  　　　　THE COURT:  So, can you get me that?  Can you

14  get me an affidavit that there are no CBAs attached to

15  Exhibit 70?

16  　　　　MR. HETTERMAN:  I will get you an affidavit as

17  to what is attached to Exhibit 70.

18  　　　　THE COURT:  All right.

19  　　　　MR. HETTERMAN:  But, furthermore, Your Honor, if

20  there is a subcontracting clause in the carpenters' CBA,

21  it doesn't apply to the PLA because the PLA says we can

22  give it to anyone, any qualified contractor, which is

23  clearly in conflict with the subcontracting clause of the

24  carpenters that says that he has to go to a Carpenter

25  contract.  Now, I know that Mr. Carroll thinks there's no

1    inconsistent there --

2              THE COURT:  MRS --

3              MR. HETTERMAN:  -- but there is.

4              THE COURT:  MRS was a carpenter contractor.

5              MR. HETTERMAN:  Well, that depends.

6              MR. CARROLL:  They abrogated.

7              THE COURT:  Well, fair enough, but --

8              MR. CARROLL:  At one point they were.

9              MR. HETTERMAN:  They did.

10             THE COURT:  The window company that you

11   mentioned --

12             MR. CARROLL:  Okay, so the sequencing is you

13   start at Berry, you go to Tower, Tower was signatory with

14   the Glaziers, ironworkers and the carpenters.  So --

15             THE COURT:  So Berry complies with its

16   subcontract requirement by hiring Tower.

17             MR. CARROLL:  And Tower has the same

18   subcontracting obligation because they are signatory -- I

19   mean it's same thing.

20             MR. HETTERMAN:  No, it isn't.  Tower Glass is

21   signatory to several different trades.

22             MR. CARROLL:  Including the carpenters and

23   including the collective bargaining agreement with the

24   carpenters.

25             MR. HETTERMAN:  And according to --

1          MR. CARROLL:  And if they chose to follow the

2     collective bargaining agreement with the carpenters,

3     what's the problem?

4          MR. HETTERMAN:  The problem is Tower Glass

5     wasn't the one who made the decision.  Berry made the

6     decision who was going to be used on the job site.

7          THE COURT:  All right, I need citations.  You're

8     making assertions, I need evidence.  So when you say

9     Berry's the one who did X, where in the record do I find

10    that.

11         MR. HETTERMAN:  That would come in the testimony

12    of Roland --

13         THE COURT:  Pages would be helpful.

14         MR. HETTERMAN:  I don't have immediate access to

15    it.  It may be within the statement of facts or whatever

16    that we supplied in terms of that.

17         THE COURT:  All right.  I need your help.

18         MR. HETTERMAN:  No, I understand, happy to do

19    that.

20         THE COURT:  It's a big record.

21         MR. HETTERMAN:  We will provide that.  I'm just

22    saying we may have ready access to it -- not within the

23    next 15 minutes, correct.

24         THE COURT:  One second.

25         (Pause)

1    MR. HETTERMAN:  Just so I'm clear, in addition

2 to the information about the Berry PLA, when you say you

3 want cites, are you looking for additional or some legal

4 authority as to the role of the PLA?

5    THE COURT:  I definitely want authority that

6 says whatever you think it ought to say regarding the PLA.

7 In other words, I'm looking at a PLA.  Now, this may not

8 be the only one, but the one we're looking at says I'm

9 incorporating Schedules A.  I've been told you're

10 disagreeing but I've been told that Schedules A are CBAs.

11 So if it's incorporated in a CBA, I'm really having

12 trouble understanding why the CBA doesn't apply.

13    MR. HETTERMAN:  Because the PLA says the

14 contracting CBA doesn't apply if its provisions conflict

15 with the PLA.

16    THE COURT:  Right.  Well --

17    MR. HETTERMAN:  And that's where you get into

18 the contracting issue, because the PLA gives the

19 Construction Manager leeway as to how to make the work

20 assignment --

21    THE COURT:  Correct.

22    MR. HETTERMAN:  -- that he does not have under

23 the carpenters' CBA.

24    THE COURT:  But you can't, for that very reason

25 you can't hold carpenters liable for the fact that Berry

1    goes and says assign work to carpenters.

2              MR. HETTERMAN:  Well --

3              THE COURT:  Because you're correct that the PLA

4    says Berry can do whatever the heck he wants to do.  He

5    can assign to whomever he wants to assign it to.  And so

6    if he happens to choose, for whatever reason -- he's got a

7    CBA, he just likes them, whatever -- he happens to choose

8    to assign it to a Carpenter, how is that a problem?

9              MR. HETTERMAN:  Because we know that's not what

10   happened.  They didn't assign it to the carpenters because

11   they wanted to assign it to carpenters; they assigned it

12   to the carpenters because they had an agreement to assign

13   it to the carpenters.  And that agreement, that MOU, is

14   the problem.

15             THE COURT:  That's, that's --

16             MR. HETTERMAN:  That's the unlawful restraint of

17   trade.

18             THE COURT:  Why isn't that simply Berry saying I

19   can give it to whomever I want, but because I've got this

20   agreement, I think I'll give it to them.  What's wrong

21   with that?

22             MR. HETTERMAN:  Well, first of all --

23             THE COURT:  He's got authority to do whatever he

24   wants.  That's not a restraint of trade.

25             MR. HETTERMAN:  No, but the language of the PLA

1    specifically says you cannot enter into a side agreement

2    unless everybody agrees to it.  That's at the bottom of

3    that article on page two.

4         THE COURT:  It can't be modified.  How has it

5    been modified?

6         MR. HETTERMAN:  Because it went from saying you

7    can assign the work to any qualified contractor to saying

8    no, it has to be assigned to carpenters.

9         In essence, what they're saying is take out the

10   language of the PLA that says you can assign the work to

11   any qualified contractor and insert the language says you

12   have to assign it to a Carpenter contractor.

13        THE COURT:  What is it in Exhibit 71, the MOU,

14   that you think modifies the PLA?

15        MR. HETTERMAN:  The agreement that says they

16   have to give those ten items of work to a carpenter

17   contractor.

18        THE COURT:  No, it doesn't.  It says --

19        MR. CARROLL:  No, it doesn't say that at all.

20        THE COURT:  It says "In recognition of its

21   contractual obligations with 108, they agree" -- it

22   doesn't say that the PLA, we're modifying the PLA to

23   require.

24        MR. HETTERMAN:  No, no, they were trying to keep

25   this all secret.

1          THE COURT:  But your argument is 71 is a

2    violation of 70 because it's not signed off by everybody.

3          MR. HETTERMAN:  That's true.

4          THE COURT:  But it's only a violation if 71

5    purports to modify 70.  71 does not purport to modify 70.

6    It's a side -- it's a side agreement, a Memorandum of

7    Understanding --

8          MR. HETTERMAN:  Well, I don't think, I don't

9    think you can get by the language requirement of the PLA

10   about without having everybody's agreement simply by

11   entering a side agreement that doesn't specifically say

12   we're modifying the PLA.  It's clear that they are

13   modifying the PLA.

14         THE COURT:  How is it clear?

15         MR. HETTERMAN:  Because the PLA says that the

16   construction manager is free to assign this work to any

17   qualified contractor regardless of their trade

18   affiliation.

19         THE COURT:  Right.

20         MR. HETTERMAN:  Right.  The MOU says no, you do

21   not have that.  This work has to go to a carpenter

22   contractor.  That is inconsistent.  Those are in conflict.

23         It would be as if you took the language of the

24   PLA that said qualified contractor and pulled it out and

25   replaced it with language --

1          THE COURT:  All right, I understand your

2    argument.  We've been going around and around.

3          I need to know whether Schedules A are the CBAs.

4    I need to have citations to the record regarding the

5    assertions made about who said what to whom and why the

6    decision was made.  And I need case authority regarding if

7    there's any legal rule about a PLA overriding a CBA that's

8    incorporated into the PLA.  All right.

9          MR. HETTERMAN:  Oh, I'm sorry, Your Honor.  We

10   mentioned PLAs, that we're talking a PLA job now, but are

11   you looking for the same legal citation for public bid

12   jobs?

13          THE COURT:  I think so, because --

14          MR. HETTERMAN:  Okay, that's fine.

15          THE COURT:  Because I have no authority on

16   public bid jobs.  If there's some statutory requirement

17   that hasn't been provided to me that affects whether the

18   CBA applies or not, I'd like to know that.

19          MR. HETTERMAN:  And the context, Your Honor, is

20   this was an issue that we in retrospect should have

21   addressed, but when they admitted that the CBAs don't

22   apply to PLA for public works --

23          THE COURT:  Right, I heard you say that before.

24          MR. HETTERMAN:  Yes, okay.

25          THE COURT:  I read their brief.  Okay.

1          What else do you want to argue today?

2          MR. HETTERMAN:  It's your motion.

3          THE COURT:  You want to argue the antitrust

4    effect and basically your point is there's no per se

5    violation.

6          MR. CARROLL:  There's no per se violation.  It's

7    subject to the rule of reason.  They've done -- you know,

8    our papers lay this out, but they've done no market

9    analysis; they've done no cross price elasticity analysis;

10   they've done no, no labor analysis, and those are the hall

11   marks that are required to find there's been a violation

12   of the Sherman Act and they have done none of that.

13         And our motion to strike Dr. Deak's report lays

14   out all of the infirmities in his report and why that's

15   not a reliable report.

16         But, again, their whole case hangs on the

17   precipice of whether or not there is a per se unlawfulness

18   to an exclusive agreement, and there isn't and it hasn't

19   been the law for sometime and it can't be the law, and the

20   trend on that issue is actually going the other way in

21   that any type of exclusive agreement is subject to the

22   rule of reason, and they haven't done what they need to do

23   to establish a violation under the rules.

24         MR. HETTERMAN:  And, Your Honor, I do believe

25   that we have satisfied the rule of reason, but more

1    importantly, I believe this is subject to per se or quick

2    look analysis, because if you eliminate the labor aspect

3    of it for a moment and you just look at the agreements

4    that we're talking about, in essence you're talking about

5    thousands of carpenters agreeing with hundreds, if not

6    thousands of contractors not to do work with the plaintiff

7    contractors, and to do work with the carpenter contractors

8    only where there is territorial allegations and where

9    there is price fixing in addition to the group boycott.

10   What they are saying is that you're bound by this

11   agreement over here.

12              THE COURT:  This, CBA.

13              MR. HETTERMAN:  That's what they are saying,

14   yes.

15              THE COURT:  They are saying you're bound by the

16   CBA.

17              MR. HETTERMAN:  That's what they are saying.  I

18   think they are wrong in the sense of that while the CBA

19   applies.

20              THE COURT:  But when you're talking about

21   thousands of carpenters getting together with hundreds of

22   contractors, what you're saying is hundreds of contractors

23   have signed collective bargaining agreements with the

24   carpenters union.

25              MR. HETTERMAN:  Yes.

1          THE COURT:  All right.  And what reason is there

2     to believe that that's a problem in general?

3          MR. HETTERMAN:  Well, it's a horrible problem.

4     If you eliminate the labor law, if you assume there's no

5     labor law issues here --

6          THE COURT:  No, no.

7          MR. HETTERMAN:  -- and you simply said --

8          THE COURT:  Of course.  Look, this is the real

9     world.  Every union you can name, Electrical, Plumbing,

10    carpenters, Sheet Metal Workers, they've all got CBAs with

11    hundreds and hundreds of contractors.

12         MR. HETTERMAN:  But they don't enforce them like

13    this.

14         THE COURT:  So, what is your claim, that they go

15    to court to -- to require people to comply with their

16    contract?

17         MR. HETTERMAN:  No, what they do, Your Honor,

18    they attempt to -- by and large, the discovery in this

19    case is that none of the plaintiff unions entered -- and

20    their contractors have ever been involved in efforts to

21    attempt to enforce a subcontracting clause or work

22    assignment agreement at what we call the pre-bid level.

23    That's never happened.  Only with the carpenters.  The

24    carpenters are the only union that's ever attempted to do

25    that.

1          THE COURT:  Ever attempted to enforce their

2    agreements.

3          MR. HETTERMAN:  At the pre-bid level, correct.

4    And the problem with that is that when they are attempting

5    to enforce at the pre-bid level, what the company do is

6    not going to hire any carpenters, there is no labor

7    interest involved there.

8          THE COURT:  All right.  Let's talk about that.

9    That's actual something I wanted to ask about.

10          MR. HETTERMAN:  Okay.

11          THE COURT:  I don't understand -- this was the

12    complaint and this was how you survive the motion to

13    dismiss:  Where in the record is there evidence that the

14    agreements, the collective bargaining agreements, have

15    been used to exclude plaintiffs from job sites when there

16    are no carpenters working there.

17          MR. HETTERMAN:  Well, there is ample evidence in

18    the record, Your Honor, that the --

19          THE COURT:  What I need is not adjectives but

20    citations.

21          MR. HETTERMAN:  I'm just trying to clarify

22    exactly what part the Court is asking about.  There is

23    ample evidence in the record that the carpenters were

24    attempting to enforce their work assignment agreements at

25    the pre-bid level.  Okay?

1        For example, MRS, that's what that was.  They

2   had assigned the work to MRS and then they end up taking

3   it back, which in essence is saying we should not have

4   assigned it to you in the first place.

5            THE COURT:  "They," being Berry?

6            MR. HETTERMAN:  That was Turgeon.

7            MR. CARROLL:  That was Turgeon, Your Honor.

8            MR. HETTERMAN:  Yes.

9            THE COURT:  Okay.  All right.

10           MR. HETTERMAN:  So, in essence, what they are

11  doing is saying -- and they don't deny it, they don't deny

12  they are enforcing it at the pre-bid level.

13           THE COURT:  All right.

14           MR. HETTERMAN:  And now you get --

15           THE COURT:  You're using "they" to refer to lots

16  of different entities --

17           MR. HETTERMAN:  Okay, I'm sorry.

18           THE COURT:  And so it becomes confusing.

19           MR. HETTERMAN:  I apologize.

20           THE COURT:  "They" gave the work, "they" took it

21  back, "they" are enforcing.  Let's be specific so we can

22  figure this out.

23           MR. HETTERMAN:  The carpenters have never denied

24  that they are enforcing it at the pre-bid level.  They

25  acknowledge they are doing that.  They have an agreement

1   with the construction manager and they enforce their

2   agreement with the construction manager to force the

3   construction manager to give it only to carpenters

4   contracts.  They've admitted that.

5           THE COURT:  Okay.

6           MR. HETTERMAN:  And one of the questions has

7   come up and when you talk about an unfair labor practice

8   claim and the construction industry proviso, the exception

9   to AD, is that there are several elements to that

10   defense -- on which they carry the burden, not us, they

11   do -- and in order to be protected by the construction

12   industry proviso, you have to prove that you entered into

13   the agreement with an employer in the construction

14   industry and in the context of collective bargaining

15   relationship and it was done in such a fashion that it

16   maintained, or the work is consistent with the status quo

17   in the construction industry in 1959.

18           THE COURT:  Right.

19           MR. HETTERMAN:  Okay.  And the employee issue

20   has been addressed with respect to both the element of an

21   employer in the construction industry and the context of

22   the collective bargaining relationship.

23       When the defendant filed this motion for summary

24   judgment, it argued that the construction managers in

25   question were all employers in the construction industry

1    because they have a long history of employing carpenters.

2    They provided no legal support for that proposition.

3         We responded by saying it's our position that if

4    you're an employer in the construction industry, you

5    actually have to have employees in your employ on the job

6    site.  Frankly we didn't cite any specific legal authority

7    either.

8         Then they came back and said, well, here are

9    some cases that don't support what we said in our motion

10   about this long history of hiring carpenters; rather, what

11   it says is that these cases say if you're employed, if you

12   have control over the job site, like in a PLA situation,

13   you're considered an employer in the construction industry

14   for purposes of AD, with the exception.  Okay?  But

15   there's no evidence in the record as to whether they have

16   control over the job sites.

17        And so that's where we are, and so I'll be happy

18   to answer any questions you might have with respect to

19   that, Your Honor.

20        THE COURT:  Well, what job sites do you claim

21   that carpenters used their subcontracting clause to

22   exclude plaintiff union members when the carpenters were

23   not being employed on site?

24        MR. HETTERMAN:  All of them.

25        THE COURT:  Okay.

1          MR. HETTERMAN:  Now, that's what we contend.

2     They've argued -- sorry.

3          THE COURT:  Okay, so help me understand where

4     there is evidence of that.

5          MR. HETTERMAN:  We didn't present any, because

6     it's not our burden.  This is part of their affirmative

7     defense.  So that's --

8          THE COURT:  So you're not opposing the

9     affirmative defense.

10          MR. HETTERMAN:  No, no, I'm denying that there

11     were carpenters on the job site.

12          THE COURT:  But you don't have any evidence to

13     oppose it.

14          MR. HETTERMAN:  I don't have to, until they have

15     evidence that they did, and what they did was present

16     evidence that on three projects, they employed -- that the

17     construction manager employed carpenters on the job site,

18     and we've objected to all that evidence.

19          So that's where we are.  So out of the 16

20     projects, they produced evidence that only pertained to

21     three of them.

22          THE COURT:  Sixteen?

23          MR. HETTERMAN:  Yes, Your Honor.

24          THE COURT:  Well, I have seven in the complaint,

25     I think.

1          MR. HETTERMAN:  Yes, sir.

2          THE COURT:  Right.

3          MR. CARROLL:  And this was an issue where they

4     moved to strike saying that these nine other projects that

5     Dr. Deak made some reference to in his report, and then

6     they say that because we didn't mention those, that

7     somehow raises a question of material fact on this issue,

8     but they don't tell you what the facts are.

9          And so in the reply brief, we gave every fact in

10    the record about the nine jobs, and then they objected to

11    that and they moved to strike it and didn't want you to

12    consider it.

13         So, but to answer your specific question

14    about -- and also, by the way, at Tab 54 which is their

15    responses to our interrogatories where we specifically ask

16    them in the interrogatories to identify any and all

17    projects, the seven that were identified in the complaint

18    and any one -- any other project they want to rely on that

19    they say support their claims in Count One and Count Two,

20    they didn't provide any other information about any other

21    jobs other than the seven.  They never supplemented

22    interrogatories.  We had a big issue about whether or not

23    if counsel could sign interrogatories, he said I'm

24    signing, it's the collective knowledge of every plaintiff

25    and I'm entitled to do it.  And we said fine.

1          Well, now that he's done it and they didn't

2     supplement it and they only identified seven projects they

3     said they were hanging their hat on to support these

4     claims.  And if you look at those seven projects, New Road

5     Residences, the subcontractor that did the relevant work

6     was Sun Tech.  The trades that did the work were the

7     carpenters, Glaziers and Ironworkers.  But on that job

8     there's testimony and evidence in the record that Dimeo

9     employed 11 carpenters and they did over 2,000 hours of

10    work directly employed by Dimeo on that project.  So that

11    doesn't satisfy the criteria that you asked them to

12    demonstrate.

13         The second one is the Immaculate Conception

14    school project.  That was the one that we referred to

15    before.  That was done by Turgeon.  And on that, Turgeon

16    actually had applied for and received market opportunity

17    funds which was money paid by the carpenters to pay

18    benefits for workers who actually worked with Turgeon on

19    that job.  And the Turgeon workers, union carpenters,

20    directly employed by Turgeon on the Immaculate Conception

21    school job, did 4,000 hours of work on that job.  So

22    there's no issue there on whether or not there was a

23    direct employee relationship.

24         The third one we talked about before, you have

25    the steward reports from Charley Pain who was the shop

steward.  You have an affidavit from him and you have the
Steward report and he tells you exactly what the Steward
records say and there was a carpenter, at least one
carpenter on that job everyday directly employed by Berry.

The other jobs, 360 State Street, Suffolk
Construction (ph) was the general contractor on that job.
The subcontractor who did the relevant work on that job
was CWI.  They were a subsidiary of Berlin Steel and
glaziers and ironworker did that.  No carpenters did
relevant work on that job.

St. Francis Hospital.  The work was awarded to
MRS and again CWI.  MRS was the plaintiff, CWI was a
subsidiary of the plaintiff.  Trades that did the work on
that, the relevant work on that job, glaziers, ironworkers
and Sheet Metal Workers; again no carpenters.

The third job, New London School.  Fusco was the
general contractor.  That job, the relevant work was done
a non-union basis so there was no union carpenters again
on that job.

And then the final job, which, you know, might
be the smoking gun, was Bryant University and that job was
never done.

That's it.  Those are the seven jobs they hung
their hat on in the complaint and those are the seven jobs
they said supported their claims.  They never supplemented

their answers to interrogatories to say there are these

other jobs.  There were some vague passing reference in

the record, some hearsay statement about some of these

other jobs that Dr. Deak relied on in his report.  They

made some passing reference to it and all they do is

provide a list on paragraph 46 of their counter statement

of facts, but they don't say anything about what happened

on those jobs.

        And in the reply, we provided you with

citations, record evidence, affidavits telling you exactly

what happened on those seven jobs, even though they are

not relying on those jobs to support their claims by the

very answers to interrogatories.

        So -- and he just answered you when you asked,

Your Honor, Your Honor asked him how many jobs were there

carpenters or no carpenters working and that required that

subcontractor work go to, relevant work go to carpenters

and he said all of them.  Well, I just went down all of

them and actually the answer is none of them.

        MR. HETTERMAN:  Well, the question was on how

many projects did the construction manager employ

carpenters directly, and I responded by saying our

contention is none.  They say they have evidence as to

three of them; they've forgotten the other 13.  And our

contention is we contest the evidence that they've

1    asserted for three of them.  So it's our position they

2    didn't employ any of them, the Construction Manager had no

3    carpenters employed on the job.  And Mr. Carroll admitted

4    just now on these other projects the construction manager

5    did not employ carpenters on the job.

6         MR. CARROLL:  I did not say that.  The issue is

7    relevant work, and the question was whether or not the

8    relevant work was improperly assigned to carpenters on

9    those jobs because they said doing so was an antitrust

10   violation.  On the seven jobs they relied on, only three

11   of them had carpenters doing relevant work and on every

12   one of those three jobs, the general contractor directly

13   employed carpenters on those jobs.  The other ones, no

14   relevant work was done by a Carpenter so I don't know why

15   we're talking about it.

16        MR. HETTERMAN:  Well, we are talking about it

17   because each of those cases you attempted through -- the

18   Carpenter, not you personally but the carpenters attempted

19   to enforce an agreement that said the work had to be

20   assigned to carpenters.  And in some cases, it was --

21        MR. CARROLL:  And demonstrated such overbearing

22   market power that the contractor said no, thank you.

23        MR. HETTERMAN:  In some cases, they were not

24   successful but that does not mean that that project was

25   not relevant but it shows what their intent was with

1  respect to their efforts to obtain all of this work.

2  THE COURT:  Okay.

3  MR. HETTERMAN:  And if I might just respond to

4  the discovery part, Your Honor, all of these other

5  projects came out during discovery, they were all included

6  in our experts report.  At no time did they object to it.

7  They never said this is beyond the scope of the complaint

8  or it's beyond the scope of your answers to

9  interrogatories, nothing.

10  The first time it ever came up was after they

11  filed their motion for summary judgment and original memo,

12  we pointed out that they didn't address these other

13  projects and then that's where all that came out of it, so

14  I just want to give you that.

15  THE COURT:  Well, I think it came up because you

16  suggested by not addressing it they had admitted, in your

17  view or something to that effect, which the fact that

18  there's something taken up in discovery doesn't require an

19  opposition.  If somebody is set forth in the record as

20  opposed to in discovery, then there needs to be a

21  response, but --

22  MR. CARROLL:  Just on that, Your Honor, when you

23  go back and look at the papers, Tab 54 of our summary

24  judgment papers, it's their responses, Your Honor.  First

25  question, and they all follow the same pattern, but "With

1    respect to each project listed in paragraph 63 through 94

2    of the complaint, and any other projects or conduct on

3    which you base your claims, state the basis," and then go

4    through.  Look at the answer to that and you'll have

5    everything that they are relying on that was signed and

6    attested as being the full truth by Mr. Hetterman on

7    behalf of the collective knowledge of all the plaintiffs.

8         MR. HETTERMAN:  And our response, Your Honor, is

9    if they have some concern about the scope of discovery

10   they should have raised it at an earlier opportunity.

11   When they got Dr. Deak's report, they could have said,

12   hey, you included all these projects that were not

13   disclosed in discovery.  But they didn't.

14        MR. CARROLL:  But we did move to strike

15   Dr. Deak's report.

16        MR. HETTERMAN:  But you never objected to the

17   use of those projects.

18        MR. CARROLL:  On that --

19        THE COURT:  Well, but there is a distinction

20   there.  In other words, an expert can rely on lots of

21   things that the plaintiff may not be relying on, so when

22   you get an interrogatory that says what are you relying

23   on, you do have an obligation, I think, to --

24        MR. HETTERMAN:  Well, and I think it was in

25   discovery, Your Honor, but certainly when the expert says

1    I relied upon these projects, which I got from the

2    discovery in the case, that the defendant would reasonably

3    expect, okay, they are going to rely upon these projects,

4    and they could have done what they did in their reply in

5    their original memorandum.  And to this day, they've never

6    offered any reasonable explanation as to why they didn't

7    address those projects in their original memorandum.  They

8    just ignored that.

9            THE COURT:  Well, I think they just offered

10   that, because in Exhibit Number 54 you didn't mention --

11           MR. HETTERMAN:  But the problem, Your Honor, is

12   in their memorandum they specifically acknowledge at page

13   32 that plaintiffs have asserted violations with respect

14   to 16 projects.

15           Now, it's very difficult for them to acknowledge

16   that we're complaining about 16 projects and then turn

17   around and say, oh, we didn't know that you were

18   complaining about 16 projects, we thought you were only

19   complaining about seven.

20           MR. CARROLL:  Two final ponts, Your Honor?

21           THE COURT:  Yes.

22           MR. CARROLL:  Every piece of evidence in the

23   record about those other nine projects is attached as

24   Exhibit A to our reply brief.  They are all listed there,

25   what those other nine projects are.  All you have is

1    allegations and unsupported hearsay and somebody made some

2    reference in some deposition testimony about some other

3    job that somebody told them that about that this person

4    said the carpenters said you had to use carpenters.  So

5    you -- take at look at that as to what the accuracy of the

6    record is.

7          The other thing I just want to come back to, and

8    I know Your Honor asked a question about their contention

9    that in order to subcontract and enforce a subcontracting

10    clause, a contractor has to have a carpenter on the

11    payroll.  There's no case law to support that proposition.

12    In fact, the Wolke case and the Adams case that we cite to

13    make it clear that is absolutely not the law.  You do not

14    have to have an employee working for a General Contractor

15    to bind a General Contractor to a subcontracting clause.

16          That's what the -- on the specific job site, I

17    should say.  They are trying, they are trying to focus on

18    some myopic view that the analysis is done on a project by

19    project basis.  The analysis is if the clause is in effect

20    within the context of the collective bargaining agreement,

21    and no where in there does it say there has to be a

22    specific job by job analysis.

23          That's what the Adams case says.  The Adams case

24    actually previewed the argument they made here and said it

25    is ridiculous and it is absurd.

1      So, any notion they are saying you have to find

2 that in order to uphold these agreements is simply not the

3 case and that's not what the law is and they cited no law

4 to support this unfounded assertion.

5      MR. HETTERMAN: Your Honor, with respect to

6 those nine projects, they didn't identify them in their

7 original memorandum so we had no obligation to respond to

8 them.

9      As far as the cases cited by Mr. Carroll just

10 now, those involved PLAs, and what the Court said was that

11 employees were employed under the PLA on that job site.

12 By comparison, our position is, is that no employees are

13 hired under the carpenters construction manager CBA. Now,

14 if you can show that employees are hired under that CBA,

15 fine, just like employees are hired under the PLA;

16 otherwise, they are not employed in the construction

17 industry, nor is the agreement entered into in the context

18 of a collective bargaining agreement relationship because

19 they don't have any employees on site.

20      MR. CARROLL: Well, actually we did provide you

21 with evidence of that and it's in the record and it talks

22 about the long history of all of these contractors have

23 had with the carpenters and the number of employees that

24 they've hired, the number of carpenters they've had, so if

25 you want to look at the test as to whether or not these

1   are employed in the construction industry and the clause

2   that we're talking about here is arrived in the context of

3   a collective bargaining agreement, there's no question on

4   this record both of those answers are yes and that this is

5   a case that has absolutely no business being scrutinized

6   under the Sherman Act.

7           THE COURT:  Okay.  Well, I'm actually 35 minutes

8   late for my next conference call so --

9           MR. HETTERMAN:  We apologize.

10          THE COURT:  -- I will cut things off here it may

11  be that we, it may be that we seek some other information

12  from you, but I've said couple times that I'm looking for

13  help from both of you on a couple of issues.

14          MR. CARROLL:  When would you like that, Your

15  Honor?

16          THE COURT:  Well, sooner the better.  Two weeks?

17  is that fine?

18          MR. HETTERMAN:  Would that be a simultaneous

19  submission, Your Honor?  Both sides file at the same time?

20          MR. CARROLL:  As I understand it, Your Honor,

21  what you're looking for is something to tell you what

22  Schedule A was to the Bay State project?

23          THE COURT:  Schedule A, what was Schedule A, any

24  authority one way or the other on PLAs and CBAs and their

25  interaction, especially in the context of if Schedule As

1    are the CBAs, why a PLA would preclude a CBA that's

2    incorporated into its terms from applying.

3            But also, especially from the plaintiff's point

4    of view, a lot of assertions are being made that I don't

5    feel like they are getting backed up by record evidence,

6    so point me to the record evidence for propositions that

7    are critical to your arguments.  Whether they are disputed

8    or undisputed, just this is what we're relying on.  For

9    example, the deposition you mentioned, you know,

10   somebody's deposition, these two pages, these lines.  Give

11   me something so I can --

12           MR. GLADNEY:  Your Honor, you want the public

13   works discussion as well, correct?  You mention --

14           THE COURT:  The public bidding?

15           MR. GLADNEY:  Yes.

16           THE COURT:  Public bidding as well, yes.  Thank

17   you.

18           MR. GLADNEY:  Yes.

19           THE COURT:  If there's some law out there that

20   says we -- if there's some state law that says we ignore

21   federally regulated CBAs when we have public bidding

22   projects, I'd be interested in knowing that.

23           MR. HETTERMAN:  Your Honor, if we file those in

24   two weeks, again, are both sides to file at the same time?

25           THE COURT:  I think so, I think that's fine.

1          I do have one housekeeping matter.  There's an

2   old motion, Number 79, it's a motion to compel

3   interrogatory responses.  It's an old motion so I'm

4   bringing it up.  Does anybody recall that?  I'm hoping

5   it's moot at this point.

6          MR. HETTERMAN:  Who filed it, Your Honor?

7          MR. CARROLL:  Yes, he filed a motion for us to

8   compel our responses to interrogatories which he has and

9   he got them.  I mean we responded to it.

10         MR. HETTERMAN:  If it's our motion, Your Honor,

11  yes, we're fine.  I don't know that it's our motion but if

12  it is our motion, then we've got no problem.

13         THE COURT:  Well, give me one second.

14         (Pause)

15         MR. CARROLL:  That was their motion, I can tell

16  you.  It was their motion.  They asked for our --

17         THE COURT:  Plaintiff's motion.

18         MR. CARROLL:  -- answers to interrogatories

19  which they have, so it is moot.

20         THE COURT:  So I'm going to deny Number 79 as

21  moot.

22         MR. HETTERMAN:  We degree.

23         MR. CARROLL:  Thank you.

24         THE COURT:  Thank you so much.  We'll stand in

25  recess.

1           (Whereupon the above matter was adjourned at 5:10

2     o'clock p. m.)

C E R T I F I C A T E

      I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761