**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONNECTICUT IRONWORKERS EMPLOYERS ASSOC., ET AL., Plaintiffs, | No. 3:10-cv-165 (SRU) |
| v. | |
| NEW ENGLAND REGIONAL COUNCIL OF CARPENTERS, Defendant. | |

<u>**MEMORANDUM OF DECISION AND ORDER**</u>

This case arises out of the negotiation and enforcement of a subcontracting clause in the New England Regional Council of Carpenters (the "Carpenters") collective bargaining agreements ("CBAs") with non-party construction companies and construction managers. Plaintiffs allege that the Carpenters have used the subcontracting clause of their CBAs to expand the scope of work assigned to Carpenters to include work traditionally assigned to plaintiff organizations. Plaintiffs contend that this conduct constitutes anticompetitive behavior, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (Count I), and unfair labor practices, in violation of 29 U.S.C. § 187 (Count II).

The Carpenters move for summary judgment on both counts. With respect to Count I, the Carpenters argue that the non-statutory labor exemption and the "construction industry proviso" provided in Section 8(e) of the National Labor Relations Board Act ("NLRA"), 29 U.S.C. § 158(e), shield their actions from antitrust scrutiny. The Carpenters also contend that they are not liable under Count II because, if shielded by the construction industry proviso, their conduct does not violate the NLRA.

I agree. The Carpenters have demonstrated that the construction industry proviso and

non-statutory labor exemption apply to shield their conduct arising out of lawful collective bargaining relationships.  Plaintiffs fail to adduce evidence sufficient to raise a material dispute with respect to whether such agreements in fact arose as part of lawful collective bargaining relationships.  Accordingly, the Carpenters' summary judgment motion (doc. # 85) is granted.

## I.     STANDARD OF REVIEW

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).  A district court applies the same standard "whether summary judgment is granted on the merits or on an affirmative defense such as the statute of limitations."  *Giordano v. Mkt. Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2009) (citing *Buttry v. Gen. Signal Corp.,* 68 F.3d 1488, 1492 (2d Cir. 1995)).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965 (1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").  When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative

evidence to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).  If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48.  To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim).  In short, if there is no genuine issue of material fact, summary judgment may enter.  *Celotex*, 477 U.S. at 323.

## II.    BACKGROUND[1]

A more detailed recitation of the facts is set forth in my ruling on the Carpenters' motion to dismiss (doc. # 17).  *See Connecticut Ironworkers Employers Assoc. v. New England Reg'l Council of Carpenters*, No. 3:10-cv-165 (SRU), 2012 WL 951793, at *2-6 (D. Conn. Mar. 20, 2012).  Plaintiffs ("Ironworkers") are a district council, seven locals affiliated with construction trade unions, four construction contractors, and two trade organizations.  Defendant (the "Carpenters") is a labor organization that operates throughout New England.  Ironworkers allege that the Carpenters have used their subcontracting agreements in order to expand the scope of work that is assigned to them by construction managers who are signatories to their CBAs. Ironworkers contend that such a practice violates section 1 and 2 of the Sherman Act and section 8(b)(4) of the NLRA.

### A.  Relevant Work and Market Area

The "relevant work" at issue in the case includes: exterior building enclosure systems such as exterior metal panels, composite wall panels, foam panels, and insulated panel systems; exterior panelized window systems, punched windows, curtain wall, store fronts; and metal roofing systems and related components.  The relevant work has been the subject of a series of jurisdictional disputes between the parties.  Def.'s Local Rule ("D.L.R.") 56(a)(1) Stmt. ¶ 68.

The "relevant market area" for Ironworkers' purposes is Connecticut, Rhode Island and Western Massachusetts.  There were 8,030 construction projects built in that area between 2009 and 2014.

---

[1] The following facts are drawn from the parties' Local Rule 56(a) Statements and are undisputed unless otherwise indicated.

B.  <u>The Claims</u>

Ironworkers' claims concern the enforcement of subcontracting provisions in the Carpenters' CBAs.  The subcontracting clause in certain CBAs bars signatories from subcontracting work to any firm that is not also a signatory to the Carpenters' CBAs.  D.L.R. ¶¶ 29, 31, 33.  The Carpenters argue that those provisions are commonplace in the construction industry, and point to similar provisions in CBAs to which Ironworkers are signatories.  *See* D.L.R. ¶¶ 51, 55, 56.  Ironworkers argue that the Carpenters used the subcontracting clause of the CBAs to act in concert with various non-party general contractors and construction managers to prevent plaintiff labor organizations from performing, bidding on, or benefitting from the performance of relevant work.  Ironworkers contend that enforcement of these subcontracting clauses conflicts with the traditional industry practice and permits them to obtain work traditionally performed by Iron Workers, Sheet Metal Workers, and Glaziers.  Prior to 2009, the Carpenters had never sought to bid on or perform the relevant work.  Since 2008, however, the Carpenters have worked to ensure that bids for relevant work are submitted only by employers, contractors and subcontractors who are signatory to the Carpenters' agreement.  Ironworkers allege that the above-described conduct is aimed at forcing plaintiff employers and signatories of plaintiff labor organizations to enter into CBAs with Carpenters, which would extend the representative base of Carpenters and freeze plaintiff labor organizations and their members off job sites.

Ironworkers' allegations included seven examples of projects for which the Carpenters entered into an agreement with a construction manager allegedly in violation of the antitrust or labor laws.  The non-party construction companies and their associated projects are as follows: (1) Suffolk Construction Company ("Suffolk"), 360 State Street Project, New Haven, Connecticut; (2) Dimeo Construction ("Dimeo"), New Rowe Residences, New Haven,

Connecticut; (3) Turner Construction ("Turner"), St. Francis Hospital, Hartford, Connecticut; (4) Bond Brothers ("Bond"), Bryant University Project, Smithfield, Rhode Island; (5) E. Turgeon ("Turgeon"), Immaculate Conception Catholic Regional School, Cranston, Rhode Island; (6) Berry & Sons ("Berry"), Bay State Medical Center Hospital Project, Springfield, Massachusetts; and (7) Fusco, Inc. ("Fusco"), Schools Project, New London, Connecticut.

A fuller statement of the agreements associated with the above projects is laid out in my ruling on the motion to dismiss (doc. # 17).  *See Connecticut Ironworkers*, 2012 WL 951793, at *4-6.  Each project involved an agreement between the construction manager and the Carpenters to assign relevant work to Carpenters' signatories in accordance with the CBA.  Ironworkers claim that such agreements violate sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (Count I).

In Count II, plaintiff M.R.S. Enterprises ("MRS") alleges that Carpenters violated 29 U.S.C. § 187 by forcing Turgeon to cancel MRS's contract.  Turgeon cancelled MRS's contract because MRS intended to hire plaintiff union members and not Carpenters' signatories.  MRS alleges that Turgeon's actions were caused by Carpenters' threat to enforce their subcontracting agreement with Turgeon, which required the relevant work to be performed by Carpenters' union members.

## III.    DISCUSSION

As a general rule, agreements to refrain from dealing with others, such as the union signatory subcontracting clause at issue here, are "vulnerable to challenge under federal antitrust laws unless they are protected by both the construction industry proviso and by an exemption from antitrust scrutiny."  *Local 210, Laborer's Intern. Union of North America v. Labor Relations Division Assoc. General Contractors of America, N.Y.S. Chapter, Inc.*, 844 F.2d 69, 73

(2d Cir. 1988).   The Carpenters contend that the "construction industry proviso" of section 8(e) of the NLRA and the non-statutory labor exemption to the antitrust laws permit them to enter into the challenged union signatory subcontracting clause.  Pls.' Opp'n to Def.'s Mot. Summ. J. at 12, 22.  The Carpenters further claim that, if their conduct falls within the above exceptions to antitrust and labor laws, they are also exempt from liability for any alleged violations of 29 U.S.C. § 187.

If a defendant can introduce evidence sufficient to establish an affirmative defense, a plaintiff may only avoid summary judgment by introducing evidence to counter that assertion. *Eagleston v. Guido*, 41 F.3d 865, 873 (2d Cir. 1994) (affirming grant of summary judgment on qualified immunity defense because undisputed evidence showed that officer's conduct was objectively reasonable); *see also Angevine v. State Farm Fire & Cas. Co.*, 189 F.3d 460 (2d Cir. 1999) (unreported) (affirming grant of summary judgment in favor of defendant when plaintiff failed to introduce evidence tending to show that insurance company's affirmative defense did not apply).  In order to defeat a motion for summary judgment based on a well-supported affirmative defense, a plaintiff must "adduce[] evidence . . . sufficient to create a genuine issue of material fact" with respect to whether the affirmative defense applies.  *La Barbera v. R. Rio Trucking*, No. 03CV1508 (SLT) (AKT), 2007 WL 2177063, at *4 (E.D.N.Y. July 27, 2007); *In re Cardtronics ATM Fee Notice Litig.*, 874 F. Supp. 2d 916, 923 (S.D. Cal. 2012), *aff'd*, 559 F. App'x 633 (9th Cir. 2014) (summary judgment in favor of defendant proper when plaintiffs failed to offer evidence to rebut defendant's establishment of affirmative defense).

Because I conclude that the construction industry proviso and non-statutory labor exemption to the antitrust laws apply to shield the Carpenters' conduct, I do not reach the substance of Ironworkers' antitrust allegations.  Furthermore, because the construction industry

proviso countenances Carpenters' conduct that is the subject of MRS' unfair labor practices

claim, I hold that MRS will be unable to establish a section 187 violation.  Ironworkers have

failed to raise a material dispute of fact with respect to those issues.  Accordingly, the proviso

and non-statutory labor exemption shield the defendant from liability and warrant a grant of the

Carpenters' motion for summary judgment on all counts.

### A.  Antitrust Claims (Count I)

The Carpenters contend that the construction industry proviso of section 8(e) of the

NLRA and the non-statutory labor exemption to the antitrust laws permit Carpenters to enter into

the challenged subcontracting clauses.

### 1.  "Construction Industry Proviso"

The Carpenters' subcontracting agreements with the named construction managers will

be subject to antitrust scrutiny unless they fall within the construction industry proviso of NLRA

section 8(e).  In 1959, Congress enacted the Landrum-Griffin amendments to the NLRA.  The

amendments included section 8(e), which is commonly referred to as the "hot-cargo" provision.

It provides:

> It shall be an unfair labor practice for any labor organization and any employer to
> enter into any contract or agreement, express or implied, whereby such employer
> ceases or refrains or agrees to cease or refrain from handling, using, selling,
> transporting or otherwise dealing in any of the products of any other employer, or
> to cease doing business with any other person, and any contract or agreement
> entered into heretofore or hereafter containing such an agreement shall be to such
> extent unenforceable and void: ***Provided*, That nothing in this subsection shall
> apply to an agreement between a labor organization and an employer in the
> construction industry relating to the contracting or subcontracting of work
> to be done at the site of the construction, alteration, painting, or repair of a
> building, structure, or other work:** *Provided further*, That for the purposes of
> this subsection and subsection (b)(4)(B) of this section the terms "any employer",
> "any person engaged in commerce or an industry affecting commerce", and "any
> person" when used in relation to the terms "any other producer, processor, or
> manufacturer", "any other employer", or "any other person" shall not include

persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further*, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception.

29 U.S.C. § 158(e) (emphasis in bold added).   The language in bold is commonly referred to as the "construction industry proviso" and generally exempts those in the construction industry from the prohibitions of section 8(e).  The Carpenters contend that Ironworkers' antitrust claims fail because the union signatory subcontracting clause with the construction employers is lawful under the proviso.

Plainly read, the construction industry proviso applies to agreements (1) between a labor organization and an employer in the construction industry; (2) relating to the contracting or subcontracting of work; (3) to be done at the site of construction.  29 U.S.C. § 158(e).  However, a court is required to read section 8(e) light of its "statutory setting and the circumstances surrounding its enactment."  *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 628 (1975).  In *Connell*, the Court held that, even though Congress expressly permitted labor organizations and employers in the construction industry to enter into agreements otherwise prohibited, Congress intended the proviso to apply principally to agreements in the context of a collective-bargaining relationship.  *Id.* at 629-33.   Moreover, the Second Circuit has held that, in order to adequately conduct such an analysis, the court must also determine whether the practice is consistent with "Congress' perceptions regarding the status quo in the construction industry [in 1959]."  *Local 210*, 844 F.2d at 75-76 (citing *Woelke & Romero Framing, Inc. v. N.L.R.B.,* 456 U.S. 645, 657 (1982)) (internal quotation marks omitted).  Thus, the final inquiry requires a court to consider whether the agreements were obtained in the context of a collective-bargaining relationship of the type that was contemplated at the time of section

8(e)'s enactment.

The Carpenters contend that the subcontracting clauses fall within the construction industry proviso because they satisfy all prongs of the test, including that the agreements containing the clauses were obtained in the context of a collective bargaining relationship.

Ironworkers counter that the construction industry proviso does not apply here because the defendant has not shown that: (1) the parties with whom the Carpenters entered into a CBA were "employers within the construction industry"; (2) that the conduct occurred within the context of a collective bargaining agreement; and (3) the conduct at issue is consistent with Congress' perception of practices in the construction industry in 1959.  Each of the Ironworkers' three objections relies on a strained interpretation of the construction industry proviso that is unsupported by legal authority.  None of the Ironworkers' objections raises a dispute of material fact with respect to the proviso.

### a. *Employers within the Construction Industry*

Ironworkers argue that the construction industry proviso requires that the employers must not only be "within the construction industry," but that the employers must be an employer "within the construction industry, *with respect to a particular project*."  Pls.' Opp'n to Def.'s Mot. Summ. J. at 18.  Ironworkers point to the fact that, in some instances, a construction manager would award a subcontract to Carpenters, even though there were no carpenters employed on the job.  Ironworkers argue that the failure to employ carpenters on a specific job is evidence that the subcontracting agreements are outside the scope of the construction industry proviso.

Ironworkers cite no support for that argument.  A plain reading of the statute indicates that the term "employer in the construction industry" is just that, an employer in the construction

industry—no more and no less.  The fact that a construction manager might be "employed in a managerial capacity and will not employ its own workers on the Project does not remove it from the category of 'construction employer.'"  *Albany Specialties, Inc. v. Bd. of Educ. of S. Glens Falls Sch. Dist.*, No. 99-CV-1462 (TJM), 1999 WL 1215291, at *8 (N.D.N.Y. Oct. 1, 1999). Moreover, Ironworkers' argument was specifically rejected in *A.L. Adams Constr. Co. v. Georgia Power Co.*, 733 F.2d 853, 858 (11th Cir. 1984) (rejecting plaintiff's argument that general contractor who subcontracted out all of its work did not qualify as an "employer in the construction industry").

### b.   In the Context of a Collective Bargaining Agreement

Courts interpreting the construction industry proviso have held that the "mere existence of a labor agreement that was entered into before employees were hired and before the union had demonstrated that it represented a majority of the workforce (a prehire agreement), demonstrates a sufficient collective bargaining relationship to invoke the protection of the Construction Industry Proviso under *Connell*."  *Albany Specialties*, 1999 WL 1215291, at *6 (citing *Bldg. & Constr. Trades Council v. Associated Builders and Contractors of Mass./R.I., Inc. (Boston Harbor)*, 507 U.S. 218, 229 (1993)) (internal footnotes omitted).  That is because prehire agreements are seen as "the very means by which unions and employers typically initiate a bargaining relationship in the construction industry."  *A.L. Adams Constr.*, 733 F.2d at 856.

In the denial of the Carpenters' motion to dismiss, I held that the Carpenters could only seek protection under the construction industry proviso if they could establish that the subcontracting agreements were sought or negotiated in the context of a collective bargaining relationship.  *See Connecticut Ironworkers Employers Assoc. v. New England Reg'l Council of Carpenters*, No. 3:10-cv-165 (SRU), 2012 WL 951793, at *9 (D. Conn. Mar. 20, 2012).  The

Carpenters could do so by showing that the subcontracting clause at issue was part of a valid CBA.

In support of the instant motion, the Carpenters came forward with evidence demonstrating that each of the subcontracting clauses at issue was part and parcel of an existing CBA. D.L.R. ¶¶ 29-34; Def.'s Mot. Summ. J. Br. at 15. Ironworkers did not introduce any evidence that raised a material dispute with respect to that fact.

Rather, Ironworkers countered by asserting that the subcontracting clauses at issue, though part and parcel of an existing CBA, were being enforced in a manner outside the scope of the CBA. Pls.' Opp'n to Def.'s Mot. Summ. J. 24. In support of their claim, Ironworkers argued that the subcontracting clauses in the CBAs did not apply any time the construction projects were subject to a project labor agreement ("PLA"). Mot. Summ. J. Hr'g Tr. at 43. Thus, the argument goes, in a project covered by a PLA, any attempt to enforce such clauses was an attempt to enforce an agreement outside the scope of a collective bargaining relationship.

Ironworkers falter in their effort to show that the CBAs did not apply to projects governed by a PLA. At oral argument on this motion, I asked Ironworkers to provide legal support for their assertion. Ironworkers could not do so. Rather, Ironworkers relied solely on the language of the PLA to raise an inference that it wholly replaced the existing CBA's subcontracting clause. For example, Ironworkers pointed to the PLA that governed the *Bay State Medical Center Hospital Project*. Under that PLA, the construction manager, Berry, was given the discretion to hire "any qualified contractor." Def.'s Ex. 70, at 3. Ironworkers argued that the PLA's grant of discretion is in conflict with Berry's CBA with the Carpenters, which provided that the construction manager must use Carpenters-approved subcontractors. Mot. Summ. J. Hr'g Tr. at 30-31.

Ironworkers' argument is mistaken.  None of the above evidence indicates that the CBA and PLA were in conflict.  The PLA gave Berry the discretion to hire "any qualified contractor." Berry used its discretion to hire a Carpenters' signatory contractor.  The fact that his decision was based on a prior CBA agreement with Carpenters does not negate the fact that it was Berry's decision.  There would only be a conflict between the PLA and the CBA if, as a result of the CBA, Berry was forced to hire an unqualified contractor.  That would violate the PLA's authorization to hire "any qualified contractor."  However, Ironworkers fail to show that the Carpenters' signatory contractor was not qualified.  Accordingly, Ironworkers fail to introduce sufficient evidence to raise a material dispute regarding whether the two agreements are in conflict.[2]

Ironworkers also attempted to point to the PLA associated with the 360 State Street Project in order to show a conflict between it and the Carpenters' subcontracting agreement.  The PLA contains language indicating that the subcontractor, not Carpenters, retained "full and exclusive authority for the management of its operations(s) . . . including the hiring . . . of its employees."  Def.'s Ex. 88, Art. V., Section 1.  That clause, on its face, looks like it is in direct conflict with Carpenters' subcontracting agreement with Suffolk, which required certain subcontractors to hire Carpenters' labor.  However, a closer look at the PLA indicates that the purported "full and exclusive authority" was actually subject to—and thus subordinate to—the existing CBA.  Def.'s Ex. 88, Art. V., Section 1 (subcontractors retained full and exclusive authority, "[e]xcept as expressly limited by other provisions of this Agreement," including a

---

[2] I should note that there is also some evidence indicating that the CBA was incorporated into the PLA. Each PLA at issue stated that its provisions were subject to the existing Schedules A.  Although neither party could procure a list of the Schedules A listed in the PLAs, a plain reading of the PLAs suggests that the Schedules A were a list of CBAs to be incorporated into the PLAs.  *See* Def.'s Ex. 70, at 4.  I gave Ironworkers the opportunity to dispute this inference through post-hearing supplemental memorandum, but they have failed to do so.  Furthermore, Ironworkers could not point to any legal authority indicating that CBAs were legally outside the scope of the PLAs.

provision indicating that "all Subcontractors recognize the Unions signatory hereto as the sole and exclusive collective-bargaining representative of its craft hourly wage employees employed on the Project . . . [and] [t]he Local collective bargaining Agreement(s) will be adhered to . . . ." Def.'s Ex. 88, Section 2(a), Section V.  Thus, Ironworkers again fail in their attempt to raise a material dispute regarding an alleged conflict between a PLA and any of the CBAs at issue.[3] Because no conflict has been established, Ironworkers fail in their effort to provide evidence that the challenged subcontracting clauses are being enforced outside the scope of lawful CBAs.

The record demonstrates, as a matter of law, that each of the subcontracting agreements was entered into as part of an existing, valid CBA, and thus necessarily arose in the context of a collective bargaining relationship.  Ironworkers have failed to raise a material dispute with respect to the issue and have failed to cite any legal authority compelling a contrary conclusion.

### c.   Construction Industry Practice in 1959

Finally, Ironworkers argue that they do not object to the subcontracting clauses themselves, but how they are being enforced.  The Ironworkers pivot away from cases upholding the validity of similar subcontracting clauses and distinguish those cases on the ground that none of them considered the enforcement of subcontracting clauses against contractors whose role in the construction industry did not exist in 1959.  Ironworkers argue that construction managers did not exist in 1959 and, therefore, that the Carpenters have not shown that the enforcement of the work assignment agreements against construction managers in the 2000s is consistent with the 1959 status quo.

Ironworkers' argument misses the point of *Local 210*'s test for permissibility under the

---

[3] After oral argument, I asked Ironworkers to provide support for their contention that Carpenters' enforcement of their CBA was contrary to public bid statutes.  Ironworkers failed to mention any specific public bid law that the Carpenters allegedly violated in their attempt to enforce provisions of the CBA agreement.  Accordingly I conclude that no dispute of material fact exists with respect to the allegations that the Carpenters enforced their CBA contrary to any public bid law.

construction industry proviso.  *See Local 210*, 844 F.2d at 75.  Courts must interpret the proviso

in light of Congress' concerns regarding the construction industry in 1959.  *Id.* at 75.  What

Congress saw in the industry was restrictive subcontracting clauses in collective bargaining

agreements limiting the ability of employers to deal with non-union or non-signatory

subcontractors.  *Id.*  The issue Congress confronted was the phenomenon of restrictive

subcontracting clauses between employers in the construction industry and labor.  Nothing

suggests that Congress was particularly concerned with the *title* of an individual employer in the

construction industry.  Rather, Congress was concerned with whether the employer was in the

construction industry.  Construction managers are in the construction industry and are involved

in the phenomenon of restrictive subcontracting.  Even if the title "construction manager" did not

exist in 1959, the concept of a construction industry employer engaged in subcontracting

certainly did. [4]

The Carpenters have established the requisite elements to be afforded the protection of

the construction industry proviso and Ironworkers have failed to raise any triable issue of fact

with respect to any of the elements.

### 2.  Non-Statutory Labor Exemption

Even if a clause is protected by the construction industry proviso, "it is not necessarily

beyond the reach of the federal antitrust laws."  *Local 210*, 844 F.2d at 79.  In *Connell Constr.*

*Co. v. Plumbers & Steamfitters Local Union No. 100*, the Supreme Court recognized that certain

clauses in collective bargaining agreements, even those concerning the construction industry, can

act as a "direct restraint on the business market" in a manner having "substantial anticompetitive

---

[4] I also should note that the assertion that construction managers did not exist in 1959 is quite dubious, given that Carpenters have pointed to two pre-1959 cases involving construction managers.  Nevertheless, that factual question is not material.

effects, both actual and potential."  421 U.S. 616, 625 (1975).  Restrictive clauses like the one at

issue in this case may be challenged under federal antitrust laws unless the clause is protected by

both the construction industry proviso *and* an antitrust labor exemption.  *See Local 210*, 844 F.2d

at 73.

"[T]he [Sherman] Act is aimed primarily at combinations having commercial objectives

and is applied only to a very limited extent to organizations, like labor unions, which normally

have other objectives."  *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 213 n.7 (1959).

Nevertheless, "[i]t would be a surprising thing if Congress, in order to prevent a misapplication

of [antitrust] legislation to labor unions, had bestowed upon such unions complete and

unreviewable authority to aide business groups to frustrate its primary objective."  *Allen Bradley*

*Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 325 U.S. 797, 809-10 (1945).

Courts have long recognized the tension between national antitrust policy and national

labor policy.  In light of the competing interests of congressional policy favoring both collective

bargaining under the NLRA and free competition in business, two antitrust exemptions are

recognized.  *Connell,* 421 U.S. at 622.  The statutory exemption, which the parties agree does not

apply here, provides that union activity is exempt from antitrust liability "so long as [the] union

acts in its self-interest and does not combine with non-labor groups." [5]  *United States v.*

*Hutcheson*, 312 U.S. 219, 232 (1941).  The non-statutory exemption provides that the restraints

are lawful so long as the alleged anticompetitive conduct is: inherent in the collective-bargaining

process, concerns only the parties to the collective bargaining relationship, and relates to wages,

hours, conditions of employment, or other relevant subjects of collective bargaining.  *See*

*Connell*, 421 U.S. at 622.

---

[5] The Carpenters have not claimed that the challenged agreements fall within the statutory exemption.  In any event, the agreements would not fall under the statutory exemption because the agreements concern both union and non-union conduct.  *See Local 210*, 844 F.2d at 79.

In this circuit, a court assessing whether an agreement is protected by the non-statutory labor exemption should consider the relative impact of the agreement on the product market and the interests of the union members. *See Local 210*, 844 F.2d at 79. The *Local 210* decision also instructs the district court to balance the conflicting policies embodied in labor and antitrust laws. *Id.*

The court must first consider whether the agreement at issue furthers goals that are protected by national labor law and are within the scope of traditionally mandatory subjects of collective bargaining. *Id.* Traditionally, mandatory subjects in a collective bargaining agreement include wages, hours, fringe benefits, conditions of employment, and other subjects that are more likely to embody legitimate employee concerns about compensation, workplace, or security, and less likely to be restraints on competition. *See* 1B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, at ¶ 256d3 (3d ed. 2007). Courts have held that subcontracting agreements—"the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment"—can be mandatory subjects of collective bargaining. *See Fibreboard Paper Products Corp. v. N.L.R.B.*, 379 U.S. 203, 215 (1964). Even though the Court in *Fibreboard* declined to extend its holding to all types of subcontracting, it held that the "substitution of one group of workers for another to perform the same task in the same [location] under the ultimate control of the same employer" is a mandatory subject of collective bargaining. *Id.* at 224 (Stewart, J., concurring).

Second, the court must consider whether the agreement imposes a direct restraint on the market that has substantial anticompetitive effects that do not follow naturally from the collective bargaining agreement. *Local 210*, 844 F.2d at 79-80. If the agreement is a legitimate collective bargaining agreement, then the "touchstone in assessing its validity must be the

17

policies embodied in federal labor law." *Id.* at 81.  In *Local 210*, the Court relied heavily on the fact that the subcontracting clause at issue was part of an otherwise valid collective bargaining agreement.  *Id.* at 80.  The Court held that, "in seeking the inclusion of the clause in the agreement, the union was pursuing a legitimate bargaining objective . . . to promote the close community of interests among construction workers within its jurisdiction." (internal citations, quotation marks and alterations omitted).  *Id.* at 81.  Accordingly, because the Court saw no evidence of an "antitrust conspiracy otherwise existing," both the construction industry proviso and the non-statutory labor exemption "preclude[d] any further antitrust scrutiny." *Id.*[6]  The Court was not concerned with the threat that such a holding might allow the union to achieve monopoly status.  Rather, the Court held that such a threat "would not, standing alone, necessarily mandate antitrust liability." *Id.*

In denying the Carpenters' motion to dismiss, I gave Ironworkers the opportunity to introduce evidence that tended to show that the subcontracting agreements at issue were not embodied in a legitimate collective bargaining agreement.[7]  Ironworkers once again rely on their assertion that the PLAs replace rather than incorporate the CBAs.  Ironworkers contend that any attempt to enforce Carpenters' subcontracting agreements outlined in the CBAs constitutes an agreement outside of the collective bargaining relationship.  That argument has been considered and rejected in my discussion of the applicability of the construction industry proviso.  *See supra*, Section III.A.1.

---

[6] *See also* H. Perritt, Jr., *Keeping the Government Out of the Way: Project Labor Agreements Under the Supreme Court's Boston Harbor Decision*, 12 Lab. Law. 69, 90 (1996) ("[T]he more logical relationship between the two statutes is that conduct allowed by the NLRA also is within the labor exemptions to the antitrust laws. In other words, if a project labor agreement is permitted by section 8(e), it may not be the basis of antitrust liability.").

[7] The Carpenters have come forward with evidence that the subcontracting agreements are part of the existing CBAs, which, absent evidence to the contrary, I conclude serve the legitimate goal of controlling the workplace.  D.L.R. ¶¶ 29-34; Def.'s Mot. Summ. J. Br. at 6-9.

Ironworkers also allege that the Carpenters fail to satisfy elements of the non-statutory labor exemption as outlined in *American Steel Erectors v. Local Union No. 7*, 536 F.3d 68, 77 (1st Cir. 2008).  Pls.' Opp'n to Def.'s Mot. Summ. J. at 24.  In support of that argument, Ironworkers cite a number of cases, none of which involves a subcontracting agreement similar to those in the instant case.  *Id.*  For example, Ironworkers rely on *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*—a case in which a plaintiff alleged that the defendants resorted to their "tried and true tactic of creating fear . . . sabotage and vandalism . . . if a [competition union] contractor is awarded the job."  No. 00-CV-4763 (RMB) (JCF), 2007 WL 2219513, at *2 (S.D.N.Y. Aug. 3, 2007), *report and recommendation adopted sub nom. U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00-CV-4763 (RMB) (JCF), 2007 WL 2746902 (S.D.N.Y. Sept. 18, 2007), *aff'd*, 366 F. App'x 290 (2d Cir. 2010).  Ironworkers also point to *Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, a case in which the Supreme Court refused to apply the non-statutory labor exemption to an agreement that prohibited employers from buying goods manufactured by companies employing non-union labor.  325 U.S. 797, 809 (1945).  All of the alleged agreements in those cases shared one of two characteristics: either they did not arise out of a collective bargaining relationship or they involved an agreement that far exceeded the scope of a lawful CBA.

In this case, however, each subcontracting agreement did not just arise in the *context* of a collective bargaining relationship, but also was a *part* of an existing CBA.  D.L.R. ¶¶ 29-34. Furthermore, Ironworkers fail to cite any cases indicating that the type of subcontracting agreement at issue is anything other than a lawful subject of a CBA.[8]

---

[8] Courts have also looked to the history of bargaining over a particular subject as evidence that an agreement relating to that subject fell within the non-statutory labor exemption.  *See Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of N. Am.*, *AFL-CIO v. Jewel Tea Co.*, 381 U.S. 676, 697 (1965). In the instant case, the Carpenters point to the fact that Ironworkers have similar subcontracting agreements with

This case is dissimilar to *Connell*, where the Court held that a union used extra-legal methods to pursue the legal goal of organizing as many subcontractors as possible. *See Connell*, 421 U.S. at 625. In *Connell*, the Court focused on the fact that the labor union's agreements with a general contractor were not designed to protect union members. *Id.* at 631. The union was unable to argue that the agreement was part of a valid collective bargaining relationship between the union and the general contractor because the contractor did not employ union laborers and the union had no interest in bargaining with the general contractor on their behalf. *Id.* at 619. Rather than arising out of the collective bargaining process designed to protect union member's labor interests, the agreements in *Connell* sought only to pressure subcontractors into recognizing the union as the representative of their employees. *Id.* at 631. The Court was concerned with the fact that the agreement between the general contractor and the defendant-union "did not flow naturally from elimination of competition over wages and working conditions." *Id.* at 635. Similarly, in *Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr. Trades Council*, the court held that an agreement was subject to antitrust scrutiny when it arose not out of a CBA but rather as a result of the defendant's picketing the employer for not hiring union labor. 609 F.2d 1368, 1371 (3d Cir. 1979).

Ironworkers attempt to raise a similar issue of fact with respect to Carpenters' attempt to enforce subcontracting agreements with various construction managers. For example, Ironworkers point to grievance settlements reached by the Carpenters and their various construction managers as evidence that the Carpenters are attempting to unlawfully enforce the subcontracting agreements. Pls.' Opp'n to Def.'s Mot. Summ. J. at 3, 5, 9. In those cases, the Carpenters would contact the construction manager to inform it that they would be filing a

---

their union-affiliated employers. That is even further evidence that such agreements are the proper subject of a CBA.

grievance based on the failure to assign work according to the existing CBA.  As a result of such

communications, the construction manager would typically sign an agreement indicating that it

had violated the relevant CBA and that, in the future, it would assign the work to Carpenters in

accordance with the CBA.  Def.'s Ex. 30.  Alternatively, if the construction manager felt it had

not violated the CBA, it would refuse to sign such an agreement.  Pls.' Local Rule 56(a)(2) Stmt.

¶ 48; Pls.' Suppl. Mem. in Opp'n to Def.'s Mot. Summ. J. at 9.

The described practice does not amount to evidence of an antitrust violation because it

merely shows that the Carpenters were attempting to enforce their subcontracting agreements.

Unless Ironworkers can show that such agreements are unlawful, a showing of attempts to

enforce the agreements is beside the point.  Ironworkers have failed to introduce evidence

sufficient for a fact finder to conclude that the subcontracting provisions at issue were anything

but lawful provisions of a valid CBA.  Furthermore, Ironworkers have failed to point to any

evidence of an antitrust conspiracy.  Accordingly, I hold that the subcontracting agreements are

protected by the non-statutory labor exemption.  *See Local 210*, 844 F.2d at 81.  I do not reach

the question whether, absent the non-statutory labor exemption and the construction industry

proviso, the Carpenters' conduct violated sections 1 or 2 of the Sherman Act.

B.  Unfair Labor Practices (Count II)

In the second count, plaintiff MRS alleges that the Carpenters, in concert with their

signatory construction employers, violated 29 U.S.C. § 158(b)(4) (section 8(b)(4) of the NLRA)

by encouraging and inducing its signatory contractors to refrain from entering into contracts with

MRS in violation of 29 U.S.C. § 187.  MRS claims that the Carpenters have a history of pursuing

grievances against construction managers who are believed to have violated their CBAs by

assigning covered work to non-Carpenters' signatory contractors.  Pls.' Opp'n to Def.'s Mot.

Summ. J. at 29.  One of the non-Carpenters' signatory contractors was Turgeon Construction.

MRS alleges that the Carpenters were not entitled to enforce their subcontracting clause against

Turgeon with respect to the assignment of the installation of metal panels because that

assignment was not covered by Carpenters' CBA.  MRS contends that, notwithstanding the

CBA's inapplicability, Carpenters threatened Turgeon with the enforcement of the

subcontracting clause.  Allegedly out of fear of such enforcement, Turgeon cancelled a portion of

its contract with MRS.

Section 8(b)(4) of the NLRA makes it unlawful, *inter alia,* to threaten, coerce, or restrain

any person engaged in commerce or in an industry affecting commerce, where the object thereof

is forcing or requiring any person to cease using, selling, handling, transporting, or otherwise

dealing in the products of any other producer, processor, or manufacturer, or to cease doing

business with any other person.  29 U.S.C. § 158(b)(4).  Here, MRS alleges that the Carpenters

forced Turgeon, a Carpenters' signatory, to cease doing business with MRS in violation of

section 8(b)(4).

The Carpenters move for summary judgment on the basis that MRS fails to state a claim

under section 8(b)(4).  Specifically, the Carpenters argue that the subcontracting clause is part of

a valid CBA and therefore the construction industry proviso allows the restraint.  Def.'s Mot.

Summ. J. Br. at 24-25.  Furthermore, the Carpenters contend that, even if the proviso does not

apply, the undisputed facts show that Turgeon unilaterally cancelled the work project without

any input from the Carpenters.[9]

My earlier denial of defendant's motion to dismiss the unfair labor practices claim rested

on the fact that, at the time, it was still undecided whether the construction industry proviso and

---

[9] The Carpenters also point out that injunctive relief is not available under section 187.  I need not address that issue because I have concluded that there has been no unfair labor practices violation.

non-statutory labor exemption applied.  Because I now hold both apply with respect to the subcontracting clause at issue, I conclude as a matter of law that there has been no violation of section 158(b)(4).

Section 158(b)(4) prohibits threats to enforce agreements that are in violation of other provisions of section 158, including section 158(e).  *See* § 158(b)(4)(A).  In holding that the construction industry proviso permits Carpenters' subcontracting agreement with Turgeon, I am necessarily holding that the Carpenters have not violated section 158(e) with respect to those contracts.  If the Carpenters have not entered into the contracts in violation of section 158(e), they cannot be liable under section 158(b)(4) for threatening to enforce them.  Simply put, the Carpenters are not liable for attempting—even threatening—to enforce an otherwise lawful subcontracting agreement.  Because MRS has not introduced evidence that, in a light most favorable to the plaintiff, tends to show that the Carpenters have committed a predicate violation of section 158(b)(4), MRS cannot maintain its unfair labor practices claim under section 187.[10] Summary judgment on Count II is granted in favor of the Carpenters.

## IV.    CONCLUSION

For the foregoing reasons, I conclude that both the construction industry proviso and non-statutory labor exemption apply to the claimed anticompetitive conduct.[11]  All of the challenged

---

[10] Because I have concluded that the construction industry proviso applies to shield the Carpenters from any alleged labor violation with respect to their lawful subcontracting agreements, I do not reach the question whether or not an issue of fact was raised with respect to Carpenters' role in Turgeon's rescission of MRS's contract.

[11] Ironworkers moved to strike portions of the Carpenters' reply brief and accompanying exhibits (doc. # 106).  Ironworkers argued that Carpenters violated Rule 56 and Local Rule 7(d) by introducing new materials in their reply brief and arguing outside the scope of the discussion of matters raised by Ironworkers' opposition brief. Furthermore, Ironworkers argued that Carpenters violated Rule 56 by using inadmissible evidence in support of its motion for summary judgment.  There is no need to strike those portions of the reply brief.  *See Martin v. Town of Westport*, 558 F. Supp. 2d 228, 231 (D. Conn. 2008) ("the court knows the difference between admissible and non-admissible evidence, and would not base a summary judgment decision [on the latter]").  Because I have arrived at my conclusion independent of the Carpenters' arguments in their reply brief and the alleged inadmissible evidence submitted in support of the motion for summary judgment, I deny as moot Ironworkers' motion to strike (doc. # 106).

subcontracting agreements were entered into pursuant to valid CBAs. Ironworkers have failed to introduce evidence sufficient to permit a reasonable jury to find that the CBAs are unlawful or that the Carpenters attempted to enforce them beyond their legal scope. Accordingly, the Carpenters are not subject to antitrust liability for their attempts to enforce the subcontracting agreements at issue. Furthermore, there is no evidence that enforcement of such agreements violates the prohibition on unfair labor practices set forth in section 187. Accordingly, I grant Carpenters' motion for summary judgment on Counts I and II.

The clerk shall enter judgment and close this case.

So ordered at Bridgeport, Connecticut, this 20th day of January 2016.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

## APPENDIX

Each Carpenters' signatory must agree to be bound by the terms of its CBA which, among other things, includes a subcontracting provision that requires signatories to hire subcontractors who are party to Carpenters' CBA. The text of the pertinent subcontracting provision in the three regions is provided below:

### Rhode Island

Section 1. The Employer agrees that he will not subcontract any work covered by this Agreement which is to be performed on the job site except to contractors who are parties to a collective bargaining agreement with the Union, or to a contractor who is willing to sign a collective bargaining agreement with the Union; provided that the Union with good cause may reject any such contractor. The parties recognize the Union's right to reject a contractor who it has previously terminated or a contractor that does not employ carpenters to perform work covered by this Agreement. The Union will notify the Association of any terminated contractors on a quarterly basis.

Section 2. The Employer agrees that it will not contract any work covered by this

Agreement which is to be performed on the jobsite, except from contractors who are parties to a collective bargaining agreement with the Union. The only penalty for violations of this Section is the loss of mobility of manpower set forth in Article V on the project at issue and a $ 2.50 per hour wage premium for all carpenters employed on the project. The Executive Secretary/Treasurer of NERCC or his designee may grant relief from this Section. The granting of such relief shall not constitute a violation of the favored nations clause of this Agreement.

D.L.R. ¶¶ 29, 30.

## **Connecticut**

SECTION I. The employer agrees to notify the Union when and with whom the Employer has entered into a subcontract for work to be performed in the territorial jurisdiction of the Union, before the work of the subcontractor commences, and shall further state the scope and approximate starting date of the same. No subcontractor shall commence work unless it is a party to an agreement with the Union covering the work to be performed.

SECTION 2. Any subcontractor on the site shall be covered by and subject to the terms of this Agreement except where the work covered by this Agreement is awarded or assigned directly to the Employer by a state, municipal or other public awarding authority in accordance with Connecticut law and regulations.

SECTION 3. In the event that a subcontractor does not make payment of wages, or contributions to the Funds enumerated in Schedules C and D, in accordance with the terms of this Agreement, then the Union must give the general contractor notice thereof as quickly as possible but not later than thirty days after the date payment was due. Upon notification from the Union, the general contractor agrees to hold any amounts due and owing to the subcontractor to satisfy the subcontractor's delinquency.

SECTION 4. It is agreed that the Employer will not sublet the labor or any part or parts of its work or lump out work on a piece-work basis to any worker.

D.L.R. ¶¶ 31, 32.

## **Western Massachusetts**

Except for filed sub-bids, the Employer agrees that he will not subcontract any work covered by this Agreement which is to be performed on the job site except to contractors who are parties to a collective bargaining agreement with the Union, or to a contractor who is willing to sign a collective bargaining agreement with the Union; provided that the Union may reject any such contractor. Said subcontractor must have entered into the collective bargaining agreement with the union before starting any carpentry work.

Damages for violations of the subcontracting clause shall be the value of wages and benefits for all substantiated carpentry hours worked by the subcontractor provided, however, that, with respect only to members of the CIAWM [Construction Industry Association of Western Massachusetts, Inc.] who violate the subcontracting clause, the Joint Board shall be limited in its authority to assess damages against of no more than $25,000 for each violation. In any such case where the Union seeks additional damages against a CIAWM member, it shall have the right to refer the case for additional damages to the American Arbitration Association. In cases referred to the American Arbitration Association under this provision, the sole issue shall be the amount of damages.

The Employer agrees that it will not subcontract any work covered by this Agreement which is to be performed on the job site except from contractors who are parties to a collective bargaining agreement with the Union. The only penalty for violations of this paragraph is the loss of mobility of manpower set forth in Article V on the project and a $2.50 per hour wage premium for all carpenter employees on the project. The Executive Secretary-Treasurer of the Council or his designee may grant relief from this paragraph. The granting of such relief shall not constitute a violation of the favored nations clause of this Agreement.

In order to protect and preserve work traditionally performed by carpenters under this Agreement, all exterior wall system work covered by this Agreement that has traditionally been performed on-site that is performed off-site, either by the Employer or a subcontractor of the employer, shall be performed in accordance with the wages, benefits and other economic terms provided for in this Agreement. This provision does not apply to the wood frame panels, manufactured glazed curtain wall systems and panels purchased directly from recognized manufacturers whose business is exclusively manufacturing that [is] traditionally performed off-site.

D.L.R. ¶¶ 33, 34.