# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CONNECTICUT IRONWORKERS
EMPLOYERS' ASSOCIATION, et al.,
    Plaintiffs,

    v.

NEW ENGLAND REGIONAL
COUNCIL OF CARPENTERS,
    Defendant.

No. 3:10-cv-00165 (SRU)

## RULING AND ORDER

This case involves a "turf battle" between two sets of construction organizations. The defendant, New England Regional Council of Carpenters (the "Carpenters"), has entered into collective bargaining agreements ("CBAs") with non-party construction companies and construction managers (collectively, the "employers"). The agreements contain restrictive subcontracting clauses (sometimes known as "hot cargo" clauses, but which I call the "CBA clauses") that prohibit signatories from subcontracting work to any employer that has not acceded to a Carpenters' CBA. The plaintiffs—construction trade unions,[1] contractors,[2] and trade associations[3] (collectively, the "Ironworkers")[4]—allege that the Carpenters have used the CBA

---

[1] International Association of Bridge, Structural, Ornamental, & Reinforcing Iron Workers Locals Nos. 15, 37, and 424 (the "Iron Workers"); Sheet Metal Workers Locals Nos. 38 and 40 (the "Sheet Metal Workers"); and Glaziers Locals Nos. 1274 and 1333 affiliated with District Council 11 of the International Union of Painters & Allied Trades, AFL-CIO (the "Glaziers").

[2] M.R.S. Enterprises ("M.R.S."); Barrett, Inc.; Ernest Peterson, Inc. ("Peterson"); and Berlin Steel Construction Co. ("Berlin Steel").

[3] Connecticut Ironworkers Employers Association ("Connecticut Ironworkers") and Associated Sheet Metal & Roofing Contractors of Connecticut ("Sheet Metal Contractors").

[4] Two union pension funds were originally also plaintiffs. I dismissed those plaintiffs for lack of standing in March 2012. *See* 2012 WL 951793 (D. Conn. Mar. 20, 2012).

clauses to expand the scope of their work by preventing the Ironworkers from bidding on and performing work that traditionally was assigned to the Ironworkers. According to the complaint, that conduct constitutes anticompetitive behavior, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and unfair labor practices, in violation of 29 U.S.C. § 1987.

I previously granted summary judgment for the Carpenters, *see Conn. Ironworkers Emp'rs Ass'n v. New Eng. Reg'l Council of Carpenters*, 157 F. Supp. 3d 173, 175 (D. Conn. 2016) ("*Ironworkers I*"), after I concluded that the Carpenters' conduct was shielded from antitrust scrutiny by both the non-statutory exemption to the antitrust laws and the construction industry proviso contained in Section 8(e) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(e). On appeal by the Ironworkers, the Second Circuit agreed that the Carpenters' actions fell within the construction industry proviso, and affirmed with respect to the unfair labor practices claim. *See Conn. Ironworkers Emp'rs Ass'n v. New Eng. Reg'l Council of Carpenters*, 869 F.3d 92, 96–97 (2d Cir. 2017) ("*Ironworkers II*"). The Court concluded, however, that "there are factual disputes that preclude a decision on whether the conduct falls within the non-statutory exemption," and reversed with respect to the Ironworkers' Sherman Act claim. *Id.* The Court remanded "for further proceedings consistent with this opinion, including for such additional discovery as will permit the District Court to be informed of the relevant history and permit the parties to move for summary judgment or, if necessary, to proceed to trial." *Id.* at 97.

Following the remand, and before allowing additional discovery, I scheduled a new argument on the undecided issue raised by the Carpenters' previously-briefed motion for summary judgment. After examining the parties' submissions, I conclude that the Ironworkers have failed to provide evidentiary support for the actual adverse effect on competition required to

state a prima facie case for violation of the Sherman Act under the rule of reason. Therefore, I again grant the Carpenters' motion for summary judgment.

## I.     Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a summary judgment motion, the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000); *Aldrich v. Randolph Ctrl. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). "The burden of showing that no genuine factual dispute exists rests upon the moving party." *Carlton v. Mystic Transp.*, 202 F.3d 129, 133 (2d Cir. 2000). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient evidence supporting its position "to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"The trial court's function at this stage is to identify issues to be tried, not decide them," *Graham v. Long Island R.R. Co.*, 230 F.3d 34, 38 (2d Cir. 2000), and so "[o]nly when no reasonable trier of fact could find in favor of the non-moving party should summary judgment be granted." *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000). Summary judgment therefore is improper "[w]hen reasonable persons, applying the proper legal standards, could differ . . . on the basis of the evidence presented." *Sologub*, 202 F.3d at 178. Nevertheless,

> the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;

the requirement is that there be no genuine issue of *material* fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*Anderson*, 477 U.S. at 247–48.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and in such circumstances, there is "no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim). To present a "genuine" issue of material fact and avoid summary judgment, the record must contain contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

"In the context of antitrust cases," the Second Circuit has noted that "summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces." *PepsiCo v. Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002) (per curiam). Thus, "[a]lthough all reasonable inferences will be drawn in favor of the non-movant, those inferences 'must be reasonable in light of competing inferences of acceptable conduct.'" *Id.* at 105 (quoting *Top Mkts. v. Quality Mkts.*, 142 F.3d 90, 95 (2d Cir. 1998)).

## II.    Background

The Ironworkers and the Carpenters are both construction organizations that operate throughout New England. The Carpenters have entered into CBAs with many construction companies and construction managers in the region that contain restrictive subcontracting

clauses.[5] Those clauses—"colloquially called 'hot cargo' clauses"—"bar signatories from subcontracting work to any employer that is not also a signatory to a Carpenters' CBA." *See Ironworkers II*, 869 F.3d at 97. The Ironworkers allege that the Carpenters have used the CBA clauses anticompetitively "to prevent the Ironworkers from performing the relevant work," thereby "secur[ing] work in the New England area that allegedly belonged to the Ironworkers." *See id.* at 97–98. They assert that the Carpenters' conduct constitutes anticompetitive behavior in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2.

The Carpenters moved for summary judgment in May 2014, Doc. No. 85, arguing that their actions were "shield[ed] . . . from antitrust scrutiny" by "the non-statutory labor exemption and the 'construction industry proviso' provided in Section 8(e)" of the NLRA. *See Ironworkers I*, 157 F. Supp. 3d at 175. I granted the Carpenters' motion. In a ruling issued on January 20, 2016, I held that the Carpenters had "established the requisite elements to be afforded the protection of the construction industry proviso" and had also shown that "the subcontracting provisions at issue," as "lawful provisions of a valid CBA, . . . [were] protected by the non-statutory labor exemption." *Id.* at 187. Therefore, I concluded, "the Carpenters [were] not subject to antitrust scrutiny for their attempts to enforce the subcontracting agreements." *Id.* at 188.

The Ironworkers appealed and the Second Circuit reversed in part. Although the Court agreed that "the construction industry proviso applies to the disputed subcontracting practices," it decided that "disputes of material fact prevent [it] from deciding . . . whether the non-statutory exemption applie[d]." *Ironworkers II*, 869 F.3d at 104. The Court referred to the standard for

---

[5] Some of the signatories to Carpenters' CBAs are individual contractors, but most are associations of employers such as the Associated General Contractors of Rhode Island, *see* Ex. 7 to Carroll Aff., Doc. No. 88-7, the Connecticut Construction Industries Association, *see* Ex. 10 to Carroll Aff., Doc. No. 88-10, and the Construction Industry Association of Western Massachusetts. *See* Ex. 12 to Carroll Aff., Doc. No. 88-12.

applying the non-statutory exemption set forth in *Local 210, Laborers' International Union of North America v. Labor Relations Division, Associated General Contractors of America, New York State Chapter*, 844 F.2d 69 (2d Cir. 1988) ("*Local 210*"):

> First, the agreement at issue must further goals that are protected by national labor law and that are within the scope of traditionally mandatory subjects of collective bargaining. Second, the agreement must not impose a direct restraint on the business market [that] has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions that results from collective bargaining agreements.

*Id.* at 79–80 (citations, internal quotation marks, and alterations omitted).

With respect of the first prong of the *Local 210* test, I had relied on *Local 210* and a Supreme Court decision on which it relied, *Fibreboard Paper Prod. Corp. v. NLRB*, 379 U.S. 203 (1964) ("*Fibreboard*"), for the proposition that most "subcontracting clauses *are* within the scope of the mandatory subjects of collective bargaining." *See Ironworkers II*, 869 F.3d at 107. Quoting Justice Stewart's concurrence in *Fibreboard*, I concluded that "the 'substitution of one group of workers for another to perform the same task in the same location under the ultimate control of the same employer' is a mandatory subject of collective bargaining." *Ironworkers I*, 157 F. Supp. 3d at 184 (quoting *Fibreboard*, 379 U.S. at 224 (Stewart, J., concurring)) (internal brackets omitted). Because "each subcontracting agreement . . . was a part of an existing CBA," and the Ironworkers failed to show that "the type of subcontracting agreement at issue [was] anything other than a lawful subject of a CBA," I held that the CBA clauses were protected by the non-statutory exemption. *Id.* at 92 (emphasis removed).

The Second Circuit deemed my reliance on *Local 210* and *Fibreboard* "misplaced." *Ironworkers II*, 869 F.3d at 107. Both decisions, the Court determined, were "premised on the fact that the particular subcontracting clauses . . . were designed to '*preserve* work traditionally performed by a union for a particular employer.'" *Id.* (quoting *Local 210*, 844 F.2d at 73)

6

(emphasis in *Ironworkers II*); *see also id.* ("[T]he 'contracting out' of the work *previously performed* by members of an existing bargaining unit is a subject about which the National Labor Relations Act requires employers and the representative of their employees to bargain collectively.") (quoting *Fibreboard*, 379 U.S. at 209 (emphasis in *Ironworkers II*). Those precedents stood only "for the proposition that work *preservation*—not restrictive subcontracting generally—is a legitimate labor purpose and a mandatory subject of collective bargaining." *Id.* With respect to the present case, the Second Circuit concluded that "the record [was] insufficient to determine whether or not the[] subcontracting clauses were in fact being used to preserve work . . . or whether [they] were used for work *expansion*." *Id.* at 108. Because the latter "purpose . . . would not fall within the scope of traditionally mandatory subjects of collective bargaining," the Court held that I "erred in finding, as a matter of law, that the disputed subcontracting practices were entitled to the protection of the 'non-statutory exemption.'" *Id.*

The Second Circuit remanded "for further proceedings consistent with [its] opinion, including for such additional discovery as will permit the District Court to be informed of the relevant history and permit the parties to move for summary judgment or, if necessary, to proceed to trial." *Id.* at 109. On remand, prior to reopening discovery, I elected to address the undecided alternative ground raised by the Carpenters' previously-briefed motion for summary judgment. This ruling addresses the unresolved issues raised by that motion.

## III.    Discussion

Following the Second Circuit's determination that the CBA clauses are not entitled to the non-statutory exemption, the Carpenters' motion for summary judgment presents two further matters for decision. First, what is the proper standard for analysis of the Ironworkers' claims? The Ironworkers insist that the CBA clauses constitute "group boycott[s]" that should be deemed

"*per se* violations of the antitrust laws." Mem. Opp'n Mot. Summ. J., Doc. No. 100, at 40. The Carpenters, conversely, argue that the CBA clauses are "exclusive dealing requirements" that should be "analyzed under the rule of reason." Mem. Supp. Mot. Summ. J., Doc. No. 86, at 32–33. I agree that the CBA clauses—which at worst substitute one group of unionized workers for another—are not "manifestly anticompetitive." *See Bus. Elecs. Corp. v. Sharp. Elecs. Corp.*, 485 U.S. 717, 723 (1988). Accordingly, *per se* condemnation is inappropriate, and I analyze the clauses under the rule of reason.

Second, do the CBA clauses function as "unreasonable" restraints under the rule of reason? The multi-part, burden-shifting rule of reason requires that the "plaintiff bear[] the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993) ("*Capital Imaging*"). Here, I conclude that the Ironworkers have failed to present evidence sufficient to show that the CBA clauses are anticompetitive under the rule of reason. As a result, the Ironworkers cannot state a prima facie case for violation of the Sherman Act, and I grant the Carpenters' motion for summary judgment.

A. Should the CBA clauses be analyzed under the *per se* rule or the rule of reason?

Most arrangements alleged to violate the antitrust laws are analyzed under the so-called rule of reason, a multi-part test through which the factfinder "weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *See Bus. Elecs. Corp.*, 485 U.S. at 723. A few arrangements, however, such as "group boycotts," are considered "unlawful *per se*." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986). In order to avoid application of the rule of reason— which entails a "burdensome" and "demanding calculus," *Am. Steel Erectors v. Local Union No.*

*7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 61, 67 (1st Cir. 2016) ("*ASE II*")—the Ironworkers attempt to obtain the benefit of the *per se* rule by "forcing the [CBA clauses] into the 'boycott' pigeonhole." *See Ind. Fed'n of Dentists*, 476 U.S. at 458. The Carpenters respond that the CBA clauses are not a "group boycott," but rather akin to "exclusive dealing requirements" that should be "analyzed under the rule of reason." Mem. Supp. Mot. Summ. J., Doc. No. 86, at 32–33. I agree with the Carpenters.

   1.  *Are the CBA clauses a proscribed "group boycott"?*

Although courts often list so-called "'[g]roup boycotts' . . . among the classes of economic activity that merit *per se* invalidation" under the antitrust laws, it is "far from certain" what conduct "fall[s] within the forbidden category." *Nw. Wholesale Stationers v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985); *see also Spectators' Commc'n Network v. Colonial Country Club*, 253 F.3d 215, 223 (5th Cir. 2001) (observing that "the distinction between boycotts that are *per se* illegal and those judged by the rule of reason is often a vexing one"). Broad dicta in older cases notwithstanding, "*per se* condemnation is not visited on every arrangement that might, as a matter of language, be called a group boycott or concerted refusal to deal." *U.S. Healthcare v. Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir. 1993). Instead, the Supreme Court has "limit[ed] the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors."[6] *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998);

---

[6] Agreements within the scope of the Sherman Act may be "'horizontal,' *i.e.*, 'agreement[s] between competitors at the same level of the market structure,' or 'vertical,' *i.e.*, 'combinations of persons at different levels of the market structure, *e.g.*, manufacturers and distributors.'" *Anderson News v. Am. Media*, 680 F.3d 162, 182 (2d Cir. 2012) (quoting *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972)). Thus, an agreement among several general contractors, or between labor unions, might impose a "horizontal" restraint; but an agreement between a labor union, which supplies labor, and a general contractor, which purchases it, could not. In the latter example, the union and the contractor are part of a "vertical chain" and do not "compete on the same horizontal plane" within the market. *ASE II*, 815 F.3d 43, 61, 62 (1st Cir. 2016).

*cf. Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999) (stating that the "classic model of a group boycott" is "a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level") (quoting *Smith v. Pro Football*, 593 F.2d 1173, 1178 (D.C. Cir. 1978)) (internal quotation marks omitted). Thus, for the Ironworkers to prevail on their boycott claim under the *per se* rule, "a horizontal agreement is a prerequisite." *PepsiCo*, 315 F.3d at 110.

The Carpenters argue that this case "obviously [does] not present" a group boycott under recent precedent, *see Ind. Fed'n of Dentists*, 476 U.S. at 458, because the challenged agreements were made "between parties at different levels of the market structure." Mem. Supp. Mot. Summ. J., Doc. No. 86, at 32. The Carpenters and the employers "did not compete" with one another; rather, the Carpenters "w[ere] an upstream supplier" of labor for the employers. *See MacDermid Printing Sols. v. Cortron Corp.*, 833 F.3d 172, 185 (2d Cir. 2016). Thus, the Carpenters argue, the agreements between the Carpenters and the employers were "no[t] . . . inherently anticompetitive" and should not be subject to *per se* treatment. *See id.*

The Ironworkers respond that the Carpenters' CBAs "involve both horizontal and vertical provisions." Suppl. Mem. Opp'n Mot. Summ. J., Doc. No. 116, at 11. As adduced at oral argument, the Ironworkers' theory appears to be that because most of the CBAs were made between the Carpenters and associations of employers, the vertical agreements between the Carpenters and the associations also operate as "horizontal agreements among the construction managers . . . [who are] parties to th[e] association[s]." *See* Mot. Hr'g Tr. (Jan. 24, 2018), Doc. No. 148, at 9. In other words, if the employers collectively agreed with the Carpenters to boycott the Ironworkers, then the employers also "agreed with each other to do it." *See id.* at 11.

I doubt that a third party's agreement with an association is by itself enough to establish a horizontal agreement among members of the association. "Mere membership in associations is not enough to establish participation in a conspiracy with other members of those associations," *Osborn v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015), *cert. dismissed as improvidently granted*, __ U.S. __, 137 S. Ct. 289 (2016) (mem.), and "concerted action does not exist every time a trade association member speaks or acts." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007 (3d Cir. 1994). In the absence of evidence that "two or more of the association's members have committed themselves to the anti-competitive activity of the . . . association," the existence of the association alone does not suffice to infer a horizontal agreement.[7] *See id.* at 1017 (Stapleton, J., concurring in part and dissenting in part). Because "membership alone is not proof of an agreement," *Nova Designs v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000), I find unpersuasive the Ironworkers' argument that "multi-employer bargaining association[s] . . . by [their] very nature, involve horizontal agreements." Mot. Hr'g Tr. (Jan. 24, 2018), Doc. No. 148, at 12–13.

I need not dwell on whether the CBAs are better regarded as horizontal, vertical, or both, however, because even were the agreements primarily horizontal, "[t]his case . . . cannot be fitted into the category of group boycott cases." *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir. 1978) (en banc). Not all horizontal agreements are *per se* violations of the antitrust laws. *See Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358, 370 (7th Cir. 1987) ("*Premier*"); *cf. Bogan*, 166 F.3d at 513, 516 ("assum[ing] plaintiffs' view of the

---

[7] Of course, "it normally will not be difficult to show the necessary agreement among a group of [ ] members" because an association typically is "controlled by its members." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1017 (3d Cir. 1994) (Stapleton, J., concurring in part and dissenting in part). That the Ironworkers have nonetheless failed to show any evidence of agreement among the employers here is therefore telling.

Agreement as primarily horizontal, rather than vertical," but nevertheless holding that "[p]laintiffs fail[ed] to establish a threshold case for *per se* treatment"). Assuming, *arguendo*, that the Carpenters' CBAs entailed horizontal agreements among members of the associations, the Ironworkers have not even hinted at any "economic incentive" for the employers to boycott them. *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1090 (6th Cir. 1996). Quite simply, the employers—as purchasers of labor—"would stand nothing to gain financially" by driving the Ironworkers out of the labor supply market. *See id.*

In order to illustrate that point, consider *Premier Electrical Construction Co. v. National Electrical Contractors Ass'n*, a case in which an employers' association actually used an agreement with a union to "eliminate a source of competition." 814 F.2d at 368. In *Premier*, the National Electrical Contractors Association ("NECA") had agreed with the International Brotherhood of Electrical Workers ("IBEW") to create a National Electrical Industry Fund, into which members of the NECA would pay one percent of their gross payroll.[8] *Id.* at 359. Because members of the NECA were required to pay into the fund, their cost of doing business increased relative to non-members, and non-members soon were able to underbid NECA members for work. *See id.* at 368. Concerned, the NECA entered into a new agreement with the IBEW under which the IBEW would obtain, as part of any collective bargaining agreement with a firm that was not a member of the NECA, a commitment that the firm also make a contribution to the National Electrical Industry Fund. *Id.* at 359. The Seventh Circuit, following the Fourth Circuit, held that the "contribution requirement [was] price-fixing, a *per se* violation of the antitrust laws," because the NECA had "used the [IBEW] to increase its rivals' costs of doing business

---

[8] The fund was intended to "defray the costs of the Association's bargaining with the Union on behalf of its members and administering their collective bargaining agreements." *Premier*, 814 F.2d 358, 370 (7th Cir. 1987).

. . . and thereby raised the market price to its own advantage." *Id.* at 368. "The result was higher prices to purchasers of electrical work and higher profits for members" of the NECA, which "could be shared with the [u]nion" to "compensat[e] it for the assistance." *Id.*

Here, unlike *Premier*, it is far from obvious how the CBA clauses could have improperly raised costs or fixed-prices. There is no reason for employers—who purchase labor—to want higher labor prices. If (contrary to the evidence in the record) the Carpenters' prices were higher, then the employers who affiliated with them would be underbid by rivals who signed with the Ironworkers. If the quality of the Carpenters' work was lower (as the Ironworkers repeatedly suggest, without evidence), then that also would comparatively advantage employers who continued to affiliate with the Ironworkers. Furthermore, employers often enter into agreements with multiple unions, *cf. Carpenters Fringe Benefit Funds of Ill. v. McKenzie Eng'g*, 217 F.3d 578, 583 (8th Cir. 2000) (noting that employer "entered into pre-hire collective bargaining agreements with multiple craft unions whose claimed work jurisdictions frequently overlap[ped]"); *Stevens Eng'rs & Constructors v. Iron Workers Local 17 Pension Fund*, 2016 WL 4479486, at *18 (N.D. Ohio Aug. 25, 2016) ("[T]he craft jurisdictions of many craft unions overlap and employers assign tasks that fall within the craft jurisdictions of multiple unions in different manners."), and different unions frequently work on a single construction project. *See, e.g.*, *Huber, Hunt & Nichols v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus., Local 38*, 282 F.3d 746, 747–48 (9th Cir. 2002). Therefore, even if a large proportion of employers acceded to the Carpenters' CBA clauses, those employers would not necessarily be able to shut out their rivals who continued to affiliate with the Ironworkers.

Indeed, notwithstanding the challenged CBA clauses, counsel for the Ironworkers admitted at the hearing that "sometimes [employers] just skip the Carpenters and bring in

Ironworkers to actually do the work."[9] Mot. Hr'g Tr. (Jan. 24, 2018), Doc. No. 148, at 69. In other words, not only did the employers lack a clear incentive to drive the Ironworkers out of the market, but also, in practice, they seem to have continued employing the Ironworkers. That being so, I simply cannot understand how the employers had any "economic motivation [to participate in] a boycott," or how the CBA clauses would have enabled both the Carpenters and the employers to "benefit[] financially at the expense of consumers." *See Betkerur*, 78 F.3d at 1090–91. "Because the Agreement's anticompetitive effect . . . is not obvious," the Ironworkers have not "made a case sufficient to cross the threshold to *per se* treatment." *Bogan*, 166 F.3d at 51.

The Ironworkers, apparently recognizing that the employers' incentive to join the posited boycott is murky at best, strive to bring their case within the rule of *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207 (1959). In *Klor's*, a large department store chain, Broadway-Hale, used its "'monopolistic' buying power" to organize a boycott of its much smaller rival, Klor's. *Id.* at 209. Klor's filed suit under the Sherman Act, alleging that manufacturers and distributors had "conspired among themselves and with Broadway-Hale either not to sell to Klor's or to sell to it only at discriminatory prices and highly unfavorable terms." *Id.* The Supreme Court held that the defendants had "[p]lainly" engaged in a group boycott. *Id.* at 212. The Court observed that Klor's "[a]lleged . . . a wide combination consisting of manufacturers, distributors and a retailer," which "t[ook] from Klor's its freedom to buy . . . in an open competitive market and dr[ove] it out of business as a dealer in the defendants' products," and also "deprive[d] the manufacturers and distributors of their freedom to sell to Klor's." *Id.* at 213. Thus, the Court

---

[9] Counsel for the Carpenters represented that the Ironworkers worked on four of the seven projects mentioned in the complaint. Mot. Hr'g Tr. (Jan. 24, 2018), Doc. No. 148, at 69.

concluded that the alleged conduct "clearly ha[d], by its 'nature' and 'character,' a 'monopolistic tendency,'" and was to be regarded as illegal *per se*. *See id.*

*Klor's* is admittedly difficult to reconcile with more recent cases, which have "recognized that the scope of *per se* illegality should be narrow in the context of vertical restraints." *Bus. Elecs. Corp.*, 485 U.S. at 724; *cf., e.g.*, *Ron Tonkin Gran Turismo v. Fiat Distribs.*, 637 F.2d 1376, 1382 (9th Cir. 1981) (noting that "*Klor's* has often been criticized"). In *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998), the Supreme Court distinguished *Klor's* on the basis that the case "involv[ed] not simply a 'vertical' agreement between supplier and customer, but . . . [also] a 'horizontal' agreement among competitors." *Id.* at 136. That is, not only did Broadway-Hale vertically agree with each manufacturer and distributor to boycott Klor's, but also the manufacturers and distributors "horizontal[ly] agree[d] among [themselves] . . . to hurt [Broadway-Hale's] competitor." *Id.* at 135. Taken together, *Klor's* and *NYNEX Corp.* indicate that the *per se* rule continues to apply to "situations in which a vertical player organizes a horizontal cartel." *United States v. Apple, Inc.*, 791 F.3d 290, 323 (2d Cir. 2015).

In other words, *Klor's* entailed an instance of a "hub-and-spoke" conspiracy, "in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'" *Id.* at 314. According to the Second Circuit, hub-and-spoke arrangements "consist of *both* vertical agreements between the hub and each spoke and a horizontal agreement among the spokes 'to adhere to the [hub's] terms.'" *Id.* (quoting VI Areeda & Hovenkamp (3d ed.), *supra*, at ¶ 1402c). Thus, notwithstanding the "'hub-and-spoke' metaphor," the plaintiff "must also prove the existence of a 'rim' to the wheel in the form of an agreement among the horizontal competitors." *Id.* at 314 n.15. For example, in *United States v. Apple, Inc.*, the Second Circuit held that Apple had "orchestrated a horizontal conspiracy among

[publishers] to raise ebook prices" by vertically contracting with each publisher under terms that "were only attractive . . . to the extent [the publishers] acted collectively." *Id.* at 297, 320. Even though the contracts themselves "might well, if challenged, have to be evaluated under the rule of reason," the Second Circuit held that Apple was liable for the entire conspiracy under the *per se* rule because it used the vertical contracts to "organize[] a horizontal cartel." *Id.* at 323.

*Apple* shows why *Klor's* is inapposite to the present case: simply put, the Ironworkers have not placed a rim on their alleged wheel. Besides stating that the employers are members of associations (which, as noted above, is not enough to show a horizontal agreement), the Ironworkers have not shown or provided a reasonable basis to infer any agreement among the employers to drive the Ironworkers out of the market.[10] Absent such an agreement, the Carpenters' allegedly pernicious motives on their own do not suffice to overcome the "presumption in favor of [the] rule-of-reason standard." *Bus. Elecs. Corp.*, 485 U.S. at 726.

2. *Are the CBA clauses an "exclusive dealing" arrangement?*

The Ironworkers have failed to introduce "evidence of any horizontal agreement *among* general contractors or *among* [labor unions] to foreclose the plaintiffs from the . . . market." *See ASE II*, 815 F.3d at 64. Instead, the Ironworkers have shown the existence of a series of vertical agreements between the Carpenters (as suppliers of labor) and employers (as purchasers), by which the employers committed to obtain their labor only from unions affiliated with the

---

[10] Moreover, even if membership in an association sufficed, the Carpenters signed CBAs with *multiple* employers' associations, none of which are alleged to have been in horizontal agreements with one another. The amount of the market that would have been covered by any one hub-and-spoke agreement with a single employers' association would be too small to amount to a *per se* violation of the Sherman Act. *Cf. Premier*, 814 F.2d at 371 (holding that *per se* treatment was appropriate because "[t]he agreement . . . affected 100 [percent] of an economically significant market").

Carpenters. The Carpenters assert that those "vertical arrangements" most closely resemble an "exclusive dealing" agreement and should be analyzed under the rule of reason. *Cf. id.* at 67.

An exclusive dealing agreement is "a contract between a [supplier] and a buyer that forbids the buyer from purchasing the contracted [service] from any other seller." XI Phillip E. Areeda & Herbert Hovenkamp, et al., *Antitrust Law* ¶ 1800, at 3 (2d ed. 2005) ("Areeda & Hovenkamp (2d ed.)"). Unlike a group boycott, an exclusive dealing agreement "is not a *per se* violation of the antitrust laws." *Stop & Shop Supermkt. Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 62 (1st Cir. 2004) ("*Stop & Shop*"). Instead, "[e]xclusive dealing arrangements have a significant efficiency potential," were "generally approved" at common law, and "simply do not belong in a classification of practices that are even presumptively condemned without market analysis." XI Areeda & Hovenkamp (2d ed.), *supra*, ¶ 1820, at 4, 161, 163. As a result, "[e]xclusive dealing contracts are analyzed under the rule of reason."[11] *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 660 (8th Cir. 2000) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 333–35 (1961)).

The Ironworkers insist unpersuasively that the CBA clauses are not exclusive dealing agreements, and propose five criteria for identifying such arrangements. According to the Ironworkers, exclusive dealing agreements consist only of arrangements whereby:

> (1) the buyer agrees to purchase all of its "supplies" from one source;
>
> (2) the agreement provides some business justification or pro-competitive features favorable to the buyer to warrant the exclusive arrangement;

---

[11] The Ironworkers argued at the hearing that "a group exclusive dealing arrangement . . . is an oxymoron because a group exclusive dealing arrangement is the definition of a concerted refusal to deal." Mot. Hr'g Tr. (Jan. 24, 2018), Doc. No. 148, at 23–24. That reasoning begs the question, however, for it assumes that CBA clauses entail horizontal agreements among the employers. I already have determined that the Ironworkers have not supported that assumption with evidence.

> (3) the term of the arrangement is limited to a short-term, such as 2–3 years;
>
> (4) the exclusive arrangement is reached after a competitive bidding process; and
>
> (5) the agreement is vertical and not horizontal.

Suppl. Mem. Opp'n Mot. Summ. J., Doc. No. 116, at 10–11.

The first and last of the Ironworkers' proposed criteria are (partially) correct,[12] but the middle three only relate to the *reasonableness* of an exclusive dealing agreement, not whether it constitutes such an agreement at all. By asserting that "there are no pro-competitive effects or business justifications" to support the CBA clauses, *see* Suppl. Mem. Opp'n Mot. Summ. J., Doc. No. 116, at 11; that the Carpenters' "arrangements with the various [employers] have been in existence for over 20 years," *id.* at 11; and that "there was no competitive bidding process before reaching the agreements," *id.* at 11, the Ironworkers might indicate that the CBA clauses "constitute[] an unreasonable restraint of trade . . . under the rule of reason." *Virgin Atl. Airways v. British Airways*, 257 F.3d 256, 263 (2d Cir. 2001) ("*Virgin Atl.*"). But they do not transform those plainly vertical restraints into a horizontal group boycott.[13]

---

[12] With respect to the first proposed criterion, a seller also might contract to sell exclusively to one buyer (as when a parts supplier agrees to sell only to one automobile manufacturer).

[13] Risibly, the Ironworkers also suggest that the CBA clauses are not exclusive dealing agreements because the general contractors and the unions are not in "a 'business' relationship, but rather, a 'labor' relationship." Suppl. Mem. Opp'n Mot. Summ. J., Doc. No. 116, at 11. That the unions are not for-profit businesses is irrelevant; for purposes of the various entities' location in the market, the unions "supply" labor and the general contractors "purchase" it. Furthermore, if the unions are conceived of as "labor" rather than "business" entities, then it is not clear why they should be subject to antitrust scrutiny at all (which was, in fact, the *Carpenters'* argument in contending that the CBA clauses fell within the non-statutory exemption).

3. *Should all non-exempt labor arrangements be regarded as* per se *antitrust violations?*

Finally, the Ironworkers try to earn *per se* treatment by invoking a presumption against superfluity. *Cf., e.g.*, *Kawashima v. Holder*, 565 U.S. 478, 486 (2012) (discussing presumption against superfluities in statutory interpretation). The reason that the Supreme Court developed the non-statutory labor exemption, they argue, "is because it was so obvious that any multi-employer bargaining association violates the antitrust laws." *See* Mot. Hr'g Tr. (Jan. 24, 2018), Doc. No. 148, at 12. Were labor agreements analyzed under the rule of reason, the Ironworkers claim that the non-statutory exemption would be unnecessary. Therefore, the Ironworkers assert, the existence of the non-statutory exemption means that *all* non-exempt agreements should be regarded as *per se* violations of the antitrust laws. That theory is flatly wrong.

The Second Circuit has expressly stated that "the failure of [a] defendant['s] claim for complete antitrust immunity does not mean that plaintiffs are entitled to prevail." *Jacobi v. Bache & Co.*, 520 F.2d 1231, 1237 (2d Cir. 1975) (Friendly, J.). The Third Circuit, too, has observed that "[a] finding that particular union conduct . . . is non-exempt . . . should not drive a court inexorably to the conclusion that the union has violated the antitrust laws." *Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr. Trades Council*, 670 F.2d 421, 426 (3d Cir. 1982) ("*Muko II*"). Precisely because "the rule of reason provides the 'breathing space' necessary" for the labor laws to work, *see Jacobi*, 520 F.2d at 1239, courts "caution against mechanical or imprudent application of the *per se* rule in the labor context." *Muko II*, 670 F.2d at 426.

In fact, when the Second Circuit has analyzed non-exempt labor conduct under the antitrust laws, it has applied the rule of reason as a matter of course. *See Berman Enters. v. Local 333, United Marine Div., Int'l Longshoremen's Ass'n*, 644 F.2d 930, 936–37 (2d Cir. 1981); *see also Commerce Tankers Corp. v. Nat'l Maritime Union of Am., AFL-CIO*, 553 F.2d 793, 802 (2d Cir. 1977) ("[E]ven if the 'nonstatutory' exemption does not apply, there is at least a substantial

question whether a *per se* approach under the antitrust laws is applicable in the case of a non-exempt labor activity."); *id.* at 802 n.8 (citing with approval Professor Handler's conclusion that "the [Supreme] Court intended that there be a full-scale rule of reason inquiry in every instance in which a non-exempt activity is claimed to be in violation of antitrust") (quoting Handler, *Labor and Antitrust: A Bit of History*, 40 Antitrust L.J. 233, 239–40 (1971)); *cf. Jacobi*, 520 F.2d at 1238 ("[W]ithin the area of supervised self-regulation contemplated by the Securities Exchange Act, *per se* concepts are generally displaced and the courts are to examine whether the particular restraint, even though it would be a *per se* violation if performed by others, was reasonable."). That precedent indicates I should apply the rule of reason in this case.

Although the Third Circuit—which has addressed the question in greater detail—has left open the possibility of applying the *per se* rule in the labor contest "where appropriate," that court also has held that "[i]n most cases the rule of reason will supply the measure of illegality." *Muko II*, 670 F.2d at 427–28. Under the Third Circuit's test, if "union activity falls outside the protection of the labor exemption," then the "court must apply traditional antitrust principles in determining whether the activity in question violates the antitrust laws." *Id.* at 427. Even assuming, *arguendo*, that the Second Circuit would follow the Third Circuit's standard, I already have determined that *per se* condemnation would not be warranted under "traditional antitrust principles." *Id.* Accordingly, the *per se* rule does not apply.

In antitrust cases, "there is a presumption in favor of [the] rule-of-reason standard," and any "departure from that standard must be justified by demonstrable economic effect." *See Bus. Elecs. Corp.*, 485 U.S. at 726. Here, the Ironworkers have not justified such a departure. Thus, I conclude that the CBA clauses must be analyzed under the rule of reason.

B. <u>Do the CBA clauses function as unreasonable restraints under the rule of reason?</u>

The rule of reason analysis "requires a burdensome multipart showing." *ASE II*, 815 F.3d at 67. First, the "plaintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *Capital Imaging*, 996 F.2d at 543. "The fact that the defendant's actions prevent a plaintiff from competing in a market is not enough, standing alone, to satisfy this initial burden of proof." *Virgin Atl.*, 257 F.3d at 264. If the plaintiff "surmounts its first hurdle," then "the burden shifts to the defendant to offer evidence of the pro-competitive 'redeeming virtues'" of the challenged conduct. *Id.*; *Capital Imaging*, 996 F.2d at 543. Should the defendant "come[] forward with such proof, the burden shifts back to plaintiff for it to demonstrate" that "the same procompetitive effect could be achieved through alternative means that are less restrictive of competition." *Virgin Atl.*, 257 F.3d at 264; *Capital Imaging*, 996 F.2d at 543. Ultimately, in order to prove a violation of the Sherman Act, the plaintiff must show that the challenged conduct "will have an actual adverse effect on competition in the relevant market." *Elec. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*, 129 F.3d 240, 244 (2d Cir. 1997).

1. *Lack of antitrust injury*

As an initial matter, I question whether the labor union plaintiffs—the Iron Workers, Sheet Metal Workers, and Glaziers—have standing to attack the CBA clauses.[14] "[I]n order to have standing to prosecute private antitrust claims, plaintiffs must show more than that the

---

[14] Previously, at the outset of the case, I denied the Carpenters' motion to dismiss the union plaintiffs' claims for lack of antitrust standing and concluded that the latter had "stated an injury that is recognized under antitrust law." 2012 WL 951793, at *14. With the benefit of a fuller record, however, I "revisit the issue on summary judgment." *See IM Partners v. Debit Direct*, 394 F. Supp. 2d 503, 521 n.12 (D. Conn. 2005); *cf. Dorking Genetics v. United States*, 76 F.3d 1261, 1271 (2d Cir. 1996) (noting that a 12(b)(6) movant "may . . . ask the district court to revisit [an] issue on summary judgment after discovery").

defendants' conduct caused them an injury." *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994). They must show "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977)). "[I]njuries resulting from competition alone are not sufficient to constitute antitrust injuries." *Id.* Instead,

> the test for antitrust injury is essentially economic. A private plaintiff must identify the economic rationale for a business practice's illegality under the antitrust laws and show that its harm flows from whatever it is that makes the practice unlawful. If the plaintiff's injury is directly related to the competitive evil that makes a practice unlawful, then that harm is antitrust injury. If, however, the harm doers not flow from a competitive evil, then it may be injury-in-fact, but not be an antitrust injury.

IIA Phillip E. Areeda & Herbert Hovenkamp, et al., *Antitrust Law* ¶ 391, at 318, 320 (3d ed. 2007) ("Areeda & Hovenkamp (3d ed.)").

In an exclusive dealing case, plaintiffs may show injury-in-fact by "argu[ing] that they are foreclosed (or excluded) from a market," i.e., that they have been "denied the ability to make sales that they would otherwise have made." *Id.* ¶ 397, at 435. But not every injury-in-fact constitutes an antitrust injury. For instance, an "exclusive-dealing partner whose business relationship was terminated in favor of another exclusive-dealing partner" is "[c]learly not a victim of antitrust injury." XI Areeda & Hovenkamp (2d ed.), *supra*, ¶ 1823, at 199.

That essentially is the situation presented here. "Hot cargo" clauses are "standard in construction industry CBAs, including those of the Plaintiff unions." *See* Mem. Supp. Mot. Summ. J., Doc. No. 86, at 10. Stripped of rhetoric, the gravamen of the Ironworkers' complaint is that the Carpenters have used their CBA clauses to enter into exclusive dealing arrangements with employers who formerly had exclusively dealt with the Ironworkers. The resulting "turf battle," *Ironworkers II*, 869 F.3d at 97, between two beneficiaries of exclusive dealing arrangements is not properly adjudicated under the antitrust laws. *Cf. Elec. Commc'ns Corp.*, 129

F.3d at 244 ("[I]t is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business.").

Consider *Balaklaw v. Lovell*, in which a hospital switched its exclusive contract for anesthesiology services from one anesthesiologist (Balaklaw) to another (King). Balaklaw challenged the hospital's exclusive dealing agreement with King under the Sherman Act. *See* 14 F.3d at 795–96. The Second Circuit held that Balaklaw had not suffered an "antitrust injury" because there was "no foreclosure of competition." *Id.* at 799 (internal quotation marks omitted). "From the consumers' point of view," the Court reasoned, "nothing about the market ha[d] changed," because Balaklaw already "had exclusive control over anesthesiology services" at the hospital "prior to the [challenged] agreement." *Id.* at 798. As a result, the hospital's choice of one set of exclusive dealing partners over another was "only a reshuffling of competitors" and did not increase or decrease opportunities for competition in the market. *Id.* at 798 (quoting *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992)). Recalling that the antitrust laws "require plaintiffs to establish that the defendants *engaged in anticompetitive conduct* that caused them an antitrust injury," *id.* at 800 (emphasis added), the Second Circuit held that Balaklaw— who "entered the competition for an exclusive contract . . . [and] lost"—did not suffer "an injury of the type the antitrust laws were intended to prevent." *Id.* at 802.

The Ironworkers attempt to distinguish *Balaklaw* on the basis that the plaintiff "had participated in a competitive process to obtain the exclusive contract," Mem. Opp'n Mot. Summ. J., Doc. No. 100, at 49, which (they allege) did not occur here. But the mere fact that the Carpenters and the Ironworkers did not participate in a formal competitive process does not mean that the choice of one over the other was more than "a reshuffling of competitors." *Cf.*

*Balaklaw*, 14 F.3d at 798. According to the Ironworkers, the work at issue here was "traditionally performed by [them]" and "never sought" by the Carpenters. *Cf. Ironworkers II*, 869 F.3d at 98; *Ironworkers I*, 157 F. Supp. 3d at 177; *see* Local Rule 56(a)2 Statement, Doc. No. 98, at 2 ("Plaintiff contractors performed eighty percent of the panel work ten years ago . . . . Iron Workers and Glaziers performed one hundred percent of the panelized window systems, punch windows, curtain wall installation and store fronts ten years ago . . . .") (internal parentheticals omitted). When the Carpenters began to obtain such work, the Ironworkers may have suffered "injury [as] a competitor," *see Virgin Atl.*, 257 F.3d at 265, but that substitution of exclusive contractors did not by itself create "an adverse effect on competition market-wide." *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001) (Sotomayor, J.). Because the Ironworkers have not shown that their injury stemmed from "impairment of the competitive structure of the market," *see Stop & Shop*, 373 F.3d at 66 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962)), they did not suffer—and do not have standing to raise—antitrust injury.[15]

"The Sherman Act . . . [is] designed to protect competition, not individual competitors." *Virgin Atl.*, 257 F.3d at 265. Here, the Ironworkers' "simple loss of business" does not establish an antitrust injury, *Stop & Shop*, 373 F.3d at 66; "at most it reflects only harm to individual competitors, not to competition." *Unity Hosp.*, 208 F.3d at 661–62.

### 2. *Lack of adverse effect on competition*

The other plaintiffs—M.R.S., Barrett, Peterson, Berlin Steel, Connecticut Ironworkers, and Sheet Metal Contractors—do appear to have antitrust standing to pursue Sherman Act

---

[15] I held to the contrary in response to the motion to dismiss because the Carpenters had merely argued that the unions' "harm[s] [were] too indirect to support standing." *See* 2012 WL 951793, at *14. As discovery has now shown, however, the problem is not that the unions' harms are indirect; it is that they are only are only harms to competitors, rather than to competition.

claims. Nevertheless, their claims (along with those of the labor unions) fail at the rule of reason's first hurdle. Viewed in the light most favorable to the Ironworkers, the evidence would not permit a reasonable trier of fact to find that "the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *Capital Imaging*, 996 F.2d at 543. To show an "adverse effect on competition," *id.*, the Ironworkers rely heavily on the testimony of their expert witness, Prof. Edward Deak. Deak's report states that the restrictive clauses "*potentially* raise[] the price" of labor by "limit[ing] . . . the number of bidders." Deak Rep., Ex. 5 to Carroll Aff., Doc. No. 88-5, at 67 (emphasis added). The report cites no evidence, however, to show that the clauses have had or are likely to have "an *actual* adverse effect" on prices. *Cf. Capital Imaging*, 996 F.2d at 543. Indeed, Deak acknowledged during his deposition that he "didn't test the [CBA clauses'] impact on price" and "didn't do any analysis about whether the [C]arpenters' conduct increased prices." Deak Dep. (Mar. 24, 2014), Ex. 6 to Carroll Aff., Doc. No. 88-6, at 8, 9. Furthermore, Deak's report admits that "[u]nion carpenter hourly wages . . . are recognized as being lower than the hourly rates for union ironworkers," Deak Rep., Doc. No. 88-5, at 64, which hardly supports the conclusion that excluding the (higher-priced) Ironworkers from bidding would increase costs.[16]

Deak speculates that overall prices might increase because "[u]nion carpenters may require more hours of labor than other union trades in performing the work," *id.*, but there is no evidence to substantiate that supposition in the record. Deak testified that he "did not do . . . any

---

[16] In their Answers to Interrogatories, the Carpenters offered "reduce[d] [ ] labor costs" due to lower "[w]age and benefit rates" as one reason that general contractors agreed to the restrictive clauses with the Carpenters. *See* Deak Rep., Ex. 5 to Carroll Aff., Doc. No. 88-5, at 73. As the leading antitrust treatise notes, "[e]xclusive contracts are often ways of organizing the market to encourage more competitive pricing than might otherwise occur," such as by "grouping purchases together into a single contract in order to reduce the costs of using the market." XI Areeda & Hovenkamp, *supra*, ¶ 1811, at 144.

analysis that said output was reduced because of the [C]arpenters" or that "the [C]arpenters' conduct resulted in a reduction in quality." Deak Dep., Doc. No. 88-6, at 9–10. Other evidence suggests that the Carpenters and the Ironworkers were equally efficient: Roland Levesque, the president and founder of plaintiff M.R.S. Enterprises, testified that the Carpenters "install[ed] exterior metal panels . . . at about the same efficiency rate as . . . sheet metal workers or ironworkers." Local Rule 56(a)1 Statement, Doc. No. 87, at 22–23 (citing R. Levesque Dep. (Dec. 18, 2013), Ex. 46 to Carol Aff., Doc. No. 88-46, at 4). The Ironworkers complain that Levesque's assessment "simply [represents] testimony of a particular witness," Local Rule 56(a)2 Statement, Doc. No. 97, at 15, but they, not the Carpenters, bear the burden to introduce sufficient evidence to show an "*actual* adverse effect on competition" under the rule of reason. *Capital Imaging*, 996 F.2d at 543. They have not done so.

The Ironworkers also fail to substantiate their Sherman Act claims by showing "market power." Market power refers to "the ability to raise prices above those that would be charged in a competitive market." *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 665 (D. Conn. 2016) (quoting *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 (1984)); *see* IIB Areeda & Hovenkamp (3d ed.), *supra*, ¶ 501, at 109 ("Market power is the ability to raise price profitably by restricting output. . . . A defendant firm has market power if it can raise price without a total loss of sales."). Market power can be shown directly, "by evidence of the control of prices or the exclusion of competition," or indirectly, by "proof that the defendant has a large percentage share of the relevant market." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006). "The relevant market consists of a relevant product market and a relevant geographic market." *Id.* For exclusive dealing claims, "a plaintiff makes a prima facie case . . . by showing market structure, power, and coverage of the exclusive-dealing arrangement sufficient to create

an inference of reduced output and higher prices in the affected market." XI Areeda & Hovenkamp (2d ed.), *supra*, ¶ 1820, at 161. The required degree of foreclosure to state a prima facie case in the exclusive dealing context is at minimum "30 or 40 percent." *See ASE II*, 815 F.3d at 61; *accord* XI Areeda & Hovenkamp (2d ed.), *supra*, ¶ 1822, at 194.

Here, the Ironworkers' effort to show market power fails because the report of their expert witness, Dr. Deak, does not establish a well-defined market or the Carpenters' share within it. The boundaries of the proposed product market are highly uncertain: Deak seems to arbitrarily limit the product market to union labor, even though many general contractors presumably hire non-union labor as well (and the Carpenters themselves allegedly "regard[] non-union carpenter work as [their primary] competition"). *See* Deak Rep., Doc. No. 88-5, at 66. In addition, Deak does not identify the dollar value of the relevant market; the total number of general contractors in the market; or even the number of signatories to the Carpenters' CBAs. *Compare id.* at 66 (stating that "[t]he [Carpenters] already ha[ve] approximately 400–700 signatory members throughout their six state region including the sub-state relevant market") *with id.* at 67 (stating that "some 700 [general contractor]s and [construction manager]s have signed with the [Carpenters] throughout New England").

With respect to the boundaries of the proposed geographic market, Deak purports to establish (based on the parties' headquarters and the jurisdictions defined in the CBAs) a precise geographic market consisting of Connecticut, Rhode Island, and four counties in western Massachusetts. *Id.* at 46. Nevertheless, throughout his report, Deak seems to rely on evidence of the Carpenters' market share throughout the larger New England region. *See, e.g.*, *id.* at 75 ("[T]he Carpenters are currently signatory with hundreds of construction managers in the New England area and continue to sign additional construction managers."). Because the Carpenters

are headquartered in Boston and maintain separate CBAs for work in the "Eastern Massachusetts Jurisdictional Area," to conflate their (perhaps dominant) market share in the Boston area with their market share in Connecticut, Rhode Island, and western Massachusetts likely overstates the Carpenters' power in the relevant geographic market. Simply put, the Ironworkers have "not supplied" the "reliable numbers" and geographic boundaries that "are an essential starting point" for a market power analysis. *See Stop & Shop*, 373 F.3d at 68.

The Ironworkers' case boils down to an unwarranted presumption against exclusive dealing agreements. They assert that "you do not have to be an expert in economics to know that if you eliminate competition, prices will eventually rise [and] quality will suffer." Mem. Opp'n Mot. Summ. J., Doc. No. 100, at 42. But that argument begs the question, for "[e]xclusive dealing foreclosing upstream rivals from access to downstream markets may not produce any competitive harm at all."[17] XI Areeda & Hovenkamp (2d ed.), *supra*, ¶ 1802, at 69. Even when a plaintiff suffers a "'foreclosure' injury" in the form of "den[ial of] access to a market" that would otherwise be open, that "private injury . . . may not be injury to *competition*." *Id.* at 71 (emphasis added). "Whether [ ] competition is injured depends on the availability of alternative[s]," as well as "how competitive the market was to begin with." *Id.* at 69.

Because the Ironworkers have not provided any evidence of "lower output and higher prices in a properly defined market," they have not shown "injury to 'competition,'" but (at most) merely injury to themselves as competitors. *See id.* That does not suffice to state a prima

---

[17] "As a matter of convention," the "upstream participant in a transaction" is the "supplier," Herbert Hovenkamp, *Antitrust Policy, Restricted Distribution, and the Market for Exclusionary Rights*, 71 Minn. L. Rev. 1293, 1307 n.64 (1987)—here, the Carpenters. Through use of the exclusionary CBA clauses, the Carpenters have "foreclos[ed] [their] upstream rivals," the Ironworkers, "from access to downstream [purchasers]," the employers. *See* XI Phillip E. Areeda & Herbert Hovenkamp et al., *Antitrust Law* ¶ 1802, at 69 (2d ed. 2005).

facie case under the rule of reason. *See NYNEX Corp.*, 525 U.S. at 135 ("[T]he plaintiff . . . must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself."); *Virgin Atl.*, 257 F.3d at 259 ("[W]hat the antitrust laws are designed to protect is competitive conduct, not individual competitors."). Hence, I grant the defendant's motion for summary judgment for failure to show an adverse effect on competition.

## IV.    Conclusion

For the foregoing reasons, I grant the Carpenters' motion for summary judgment. The Clerk shall enter judgment in favor of the defendant and close the case.


So ordered.

Dated at Bridgeport, Connecticut, this 23rd day of May 2018.


<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge